**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Thomas CAMPIONE, Marion Collins and John Patricelli, Defendants–Appellants.**

**Nos. 89–3121, 89–3122 and 89–3123.**

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1990.

Decided Aug. 16, 1991.

Stephen D. Anderson, argued, Dept. of Justice, Chicago Strike Force, Chicago, Ill., for plaintiff-appellee.

Patrick A. Tuite, argued, Luis M. Galvan, argued, Office of the Federal Public Defender, and Jed Stone, argued, Urban & Stone, Chicago, Ill., for defendants-appellants.

Before COFFEY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

KANNE, Circuit Judge.

For the price of two drinks, patrons could watch a nude dancing stage show at My Friend's Place in Franklin Park, Illinois. They also were presented with the opportunity to "mix" with the dancers. "Mix" means spend time with a dancer. Customers were required to pay money to mix; however, mixing was not a euphemism for prostitution exclusively. Some dancers were characterized as "light mixers" and others as "heavy mixers." Light mixers did not engage in oral sex or sexual intercourse with the patrons, heavy mixers did. Dancers received commissions based upon the time sold to patrons.

Dancers circulated among the tables and attempted to sell a "stick" to customers which entitled the customer to spend a short time with the dancer at the table. Certain areas in the bar afforded more privacy than the tables. One such area was known as the booth area; patrons were required to purchase a "small bottle" for $40.00 to $360.00 to spend time with a dancer in this area.[1] No oral sex or sexual intercourse was permitted in the booth area. The back room, another private area, consisted of a large space in the rear of the building divided into several small cubicles, each offering candlelight, a couch and an end table. A patron paid $240.00 to $720.00 for a "bottle" to spend time with dancers in this area of the bar. Only in the back room were patrons permitted to engage in oral sex or sexual intercourse with the dancers. Eighteen patrons testified to having engaged in sexual intercourse or oral sex with dancers in the back room.

Customers could charge the price of bottles on credit cards. Credit authorizations were secured via an interstate telephone call; customers then signed the credit card slip and were escorted to the back room. Patrons of My Friend's Place testified to paying by credit card for time which entitled them to engage in oral sex or sexual intercourse.

An index card file was maintained at My Friend's Place to monitor patrons. The cards included the patron's name, his credit card number, the dates of his visits and the amount he was charged. The file was used to ensure that patrons were not "policemen trying to make a bust" and to gauge how much a patron would be willing to spend on a return visit. Defendants maintained and used the file system.

All defendants were involved in the management of My Friend's Place. Thomas Campione owned the business, the building and the property on which the building was located. Campione was instrumental in setting up the credit card payment scheme, hiring dancers and waitresses, and instructing employees regarding the practices and procedures to be used at My Friend's Place. Marion Collins was the president of My Friend's Place and respon-

1. There was no rigid price structure, dancers asked for what they thought the customer would pay.

sible for the day-to-day management, including the hiring of dancers, scheduling of employees' work hours, and signing and handing out employees' paychecks. John Patricelli acted as the floor manager at My Friend's Place by greeting patrons on their arrival, checking their identification, acting as a master of ceremonies for the stage show, dealing with troublesome customers, and delivering credit card slips to National Credit Services.[2]

A jury convicted defendants of conspiracy to violate the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(d), and thirty-two violations of the Travel Act, 18 U.S.C. § 1952. The Travel Act violations arose from use of interstate telephone transmissions to secure credit card authorizations and provided the underlying predicate acts for the RICO violation.

## I.

### Defendants Campione and Collins

Defendants Campione and Collins pose a number of arguments on appeal. First, they argue that the district court erred when it failed to hold a hearing on the government's peremptory challenges of prospective jurors with Italian–American surnames. Second, they argue there was insufficient evidence that the credit card charges specified in the indictment were specifically or significantly related to the unlawful activity of prostitution as required by the Travel Act. Third, they argue that the government failed to prove that the person who made the credit card authorization phone calls also performed the "thereafter acts" required by the Travel Act. Fourth, they argue that the jury instructions should have required the jury to find an agreement among the conspirators as to which RICO predicate acts would be committed. And, finally, the defendants argue that the jury was improperly instructed that they could convict defendants on their substantive Travel Act charges based on their participation in the RICO conspiracy.

### A. Peremptory Challenges

■ Defendants argue that it was error for the district court to fail to hold a hearing on the government's peremptory challenges of prospective jurors with Italian–American surnames relying on the principles set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The question of extending *Batson* to the ethnic classification of Italian–Americans has not been addressed by the Supreme Court or this court. Other circuits have been presented with the issue, but avoided addressing it directly and instead focused on whether defendants presented a prima facie showing that Italian–Americans are a cognizable ethnic group under *Batson* and its progeny. *See United States v. Di Pasquale*, 864 F.2d 271, 276 (3rd Cir.1988) (court said even if *Batson* was not restricted to race, defendants failed to present a prima facie case), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989); *United States v. Angiulo*, 847 F.2d 956, 984 (1st Cir.1987) (defendant failed to show that Italian–Americans are a cognizable group), *cert. denied*, 488 U.S. 852, 928, 109 S.Ct. 138, 314, 102 L.Ed.2d 110, 332 (1988); *United States v. Bucci*, 839 F.2d 825, 833 (1st Cir.1988) (court said that *Batson* extends to ethnic groups that meet the criteria and defendant here failed to show that Italian–Americans meet the criteria); *United States v. Sgro*, 816 F.2d 30, 33 (1st Cir.1987) (court assumed, without deciding, that *Batson* extends to ethnic groups and then found that defendant failed to establish prima facie showing that Italian–Americans [comprise] a cognizable group), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1021, 98 L.Ed.2d 986 (1988). In each case the district judge determined

---

**2.** National Credit Services ("NCS") was formed to process credit cards for show clubs and houses of prostitution in the Chicago area. NCS provided fictitious, but approved, business names for establishments like My Friend's Place that were ineligible to accept credit cards be- cause of the illegal activities present on the premises. NCS was ultimately operated by the FBI after the "founder" of NCS turned to the FBI to escape extortionists. *See United States v. Stern*, 858 F.2d 1241, 1243 (7th Cir.1988).

that defendants failed to show that Italian–Americans or persons with Italian surnames are a cognizable group under a *Batson* analysis.

During the *voir dire* proceedings, the defendants in this case requested a side-bar conference after the judge excused two "Italian surnamed jurors" on the basis of the government's exercise of two peremptory challenges. At the side-bar conference defense counsel stated to the judge that "Italian–Americans are a recognizable ethnic group." The district judge responded, "I don't believe *Batson* extends to any ethnic group in the population and I am not sure that these people are necessarily Italian–Americans."[3] The judge asked defense counsel if they wanted to say anything else. Defense counsel answered no and made no request for an evidentiary hearing. Defense counsel made no proffer of evidence to support the assertion that the excused jurors were ethnic Italian–Americans—other than the fact that they possessed Italian-sounding surnames; nor, did they make a proffer of evidence to show that Italian–Americans are a cognizable group subjected to discrimination because of their ethnicity.

Contrary to the view expressed by the district judge, it may be that the *Batson* analysis extends to discrimination in jury selection based solely on ethnicity. *See Hernandez v. New York*, — U.S. —, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (court examined peremptory challenges to members of ethnic group on basis of race discrimination); *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987) (in context of § 1982, court defined "race" to include identifiable classes of persons who are subjected to discrimination solely because of their ancestry or ethnic characteristics). But we need not reach that issue today. We simply note that the defendants offered no evidence to establish a prima facie showing that the prosecutor exercised his peremptory challenges on the basis of ethnicity.

Given the examination process available in the selection of a petit jury, the spelling of a person's surname is insufficient—standing alone—to show that he or she belongs to a particular ethnic group. Moreover, in the context of ethnicity, a *Batson* analysis would require that the challenged jurors be members of a cognizable ethnic group that is subjected to discriminatory treatment. *See Angiulo*, 847 F.2d at 984; *Bucci*, 839 F.2d at 833; *Sgro*, 816 F.2d at 33. A conclusory statement by defense counsel that "Italian–Americans [comprise] a recognizable ethnic group," without more, does not rise to the level of a preliminary showing that Italian–Americans meet the test of a cognizable group whose members could not be excluded from a jury without justification based on factors other than ethnicity.

It was not error for the district judge to decline to hold an evidentiary hearing where no such hearing was requested and no evidence to establish a prima facie showing of discriminatory use of peremptory challenges under *Batson* was proffered when the opportunity was presented.

## B. Travel Act Violations

Defendants face a heavy burden with their claims of insufficient evidence. *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir.1988), *cert. denied*, 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989). We will review the evidence in the light most favorable to the government and affirm the jury verdict if the evidence establishes that any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Id.*

■ Defendants claim that there was insufficient evidence for the jury to have concluded that, in the words of the defen-

---

**3.** The district judge and the government expressed doubt that the excluded jurors, Michael Balsamo and James Langone, were Italian–Americans. On the other hand, two other prospective jurors, who had not been challenged by the government, could more persuasively be categorized as Italian–American. Phyliss Lazenby identified herself during *voir dire* questioning as "a Palermo, can't be any more Italian than that." Josephine Gatto said that she belonged to the "Italian Cultural Club." No such responses were forthcoming from Balsamo or Langone.

dants, "Illinois state prostitution (oral sex or sexual intercourse) occurred in connection with the charges" identified in the Travel Act counts at issue here.[4] But § 1952 refers to state law only to identify the defendant's unlawful activity, the federal crime to be proved in § 1952 is use of the interstate facilities in furtherance of the unlawful activity, not the violation of state law; therefore § 1952 does not require that the state crime ever be completed. *United States v. Peskin*, 527 F.2d 71, 79 n. 3 (7th Cir.1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). Since § 1952 does not incorporate state law as part of the federal offense, violation of the Act does not require proof of a violation of state law. *United States v. Doerr*, 886 F.2d 944, 950 (7th Cir.1989).

■ Nevertheless, defendants argue further that the indictment requires proof that the use of the phones was followed in *each* instance by an act of prostitution. But the indictments in this case are not limited, as defendants would have us believe, to oral sex or sexual intercourse. Each count reads, in pertinent part, "[the unlawful activity is] a business enterprise involving prostitution in violation of the laws of the State of Illinois, to-wit 'the Illinois revised statutes, Chapter 38, Paragraphs 8–2, 11–14, 11–15, 11–16, 11–17 and 11–19.'" Those paragraphs of the Illinois Revised Statutes refer respectively to Conspiracy, Prostitution, Soliciting for a Prostitute, Pandering, Keeping a Place of Prostitution, and Pimping. Not all paragraphs cited require proof that oral sex or sexual intercourse occurred. For example, ¶ 11–16 Pandering, states that any person who for money arranges or offers to arrange a situation in which a person *may* practice prostitution commits pandering. ILL.REV. STAT. ch. 38, para. 11–16 (emphasis added). Likewise, ¶ 11–17 Keeping a Place of Pros-

titution, states that any person who has or exercises control over the use of any place which could offer seclusion or shelter for the practice of prostitution and who knowingly grants or permits the use of such place for the purpose of prostitution keeps a place of prostitution. ILL.REV.STAT. ch. 38, para. 11–17.

Furthermore, the Travel Act targets those with intent to promote or carry on or facilitate the promotion or carrying on of any unlawful activity; it is not limited to those who engaged in the illegal activity. Unlawful activity in the context of this case means prostitution offenses in violation of the laws of the state in which they are committed. The jury did not need to determine whether acts of prostitution occurred after the approval of each of the credit card transactions listed in the indictment to reasonably conclude that the facilitation of the carrying on of prostitution offenses had occurred. It was sufficient for the government to present evidence from which a reasonable juror could find that each credit card charge entitled the patron to spend time with a dancer and provided him with the opportunity to engage in acts of oral sex or sexual intercourse. To have provided patrons with this opportunity could reasonably be found by a jury to have facilitated the promotion of the unlawful activity referred to in the indictment, that is the prostitution offenses that commonly occur when maintaining a house of prostitution.

■ Defendants maintain that most of the Travel Act counts fail for lack of proof that the credit card charges alleged were significantly related to specific acts of prostitution. It is true that "in a Travel Act prosecution the interstate travel or use must relate significantly, rather than incidentally or minimally, to the illegal activi-

---

4. The Travel Act, 18 U.S.C. § 1952, states in pertinent part,
   (a) Whoever ... uses any facility in interstate ... commerce ... with intent to—
   .  .  .  .  .
   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraph[ ] (3) [violates the Act.]
... as used in this section "unlawful activity" means (1) any business enterprise involving ... prostitution offenses in violation of the laws of the State in which they are committed. ...

ty." *United States v. Raineri,* 670 F.2d 702, 719 (7th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982). However, this court has also said that the interstate use need not be indispensable to the illegal activity, "it is enough that the use facilitates the illegal activity." *Muskovsky,* 863 F.2d at 1327 (use of interstate telephone system to attain credit card approvals significantly related to prostitution activities); *see also United States v. Stern,* 858 F.2d 1241 (7th Cir.1988) (use of interstate telephone transmissions to secure credit card approvals to pay for "escort" services facilitated prostitution activity).

In our case, as in *Muskovsky,* the unlawful activity was not physical acts of prostitution as the defendants argue. Rather, the unlawful activity referred to the prostitution offenses listed in the indictment. Use of the interstate telephone system to secure authorization for the credit card transactions set out in the indictment facilitated the carrying on of keeping a place of prostitution, one of the state offenses listed. In *Muskovsky,* the court found that "the ability of the defendant to get prior approval of credit card transactions facilitated the prostitution activities by ensuring that payment for those activities would be forthcoming." *Muskovsky,* 863 F.2d at 1327–28. In our case, the use of the telephone to secure authorization for those particular credit card transactions was significantly related to the charged unlawful activities here, that is the keeping of a place of prostitution. Use of credit cards at My Friend's Place enabled patrons to buy with ease time during which they could engage in oral sex or sexual intercourse if they so desired.[5]

In *Raineri,* the court said that the jury could readily find that the maintenance and regular use of a bank account was significant in facilitating the illegal enterprise.

*Raineri,* 670 F.2d at 717. In the case before us the jury could readily find that the maintenance and regular use of a credit card transaction approval system for the purchase and sale of blocks of time of the dancers, was significant in facilitating the illegal enterprise, here the maintenance of a place of prostitution.

As we found in *Muskovsky,* "so long as the illegal activity was not an isolated or sporadic event ... a business enterprise has been shown for purposes of the Travel Act." *Muskovsky,* 863 F.2d at 1327. In this case the unlawful activity, that is the keeping of a house of prostitution, was not an isolated or sporadic event. The back room was created to provide a comfortable area in which customers could engage in oral sex and sexual intercourse. The evidence demonstrates that on many occasions customers did engage in oral sex and sexual intercourse in this back room. While there is some indication that customers did not engage in oral sex and sexual intercourse on every visit to the back room, a juror could reasonably find that the acts of prostitution were not isolated or sporadic. In addition, as we indicated earlier in this opinion, the indictment was not limited to acts of prostitution—it included other state crimes which involved prostitution but did not necessarily require evidence of sexual intercourse or oral sex.

■ Defendants contend that failure to prove that the same individual who made the call for credit authorization also performed the "thereafter acts," amounts to a failure of proof on the Travel Act violations.[6] Defendants' entire argument here rests on the faulty premise that the person who made the phone call must have also engaged in a physical act of prostitution. To the contrary, it was sufficient for the jury to have found that the person who

---

5. We note again that Pandering, an Illinois state offense listed in the indictment, prohibits any person from arranging or offering to arrange for money a situation in which a person *may* practice prostitution. ILL.REV.STAT. ch. 38, para. 11–16 (emphasis added.)

6. Whoever uses any facility in interstate commerce with intent to promote, carry on or facili-

tate the promotion or carrying on of any unlawful activity and *thereafter* performs or attempts to perform the promotion, carrying on or facilitation thereof, violates the Travel Act. 18 U.S.C. § 1952 (emphasis added). The phrase following "thereafter" describes the thereafter acts at issue here.

made the interstate call to secure the credit card authorization also communicated that approval to the waitress or dancer who then knew that payment would be forthcoming for any acts of prostitution which the patron may request. As defendants admit in their brief,

> The dancer might charge a willing customer anywhere from $240.00 to $720.00 to go to the back room [and since] many customers did not have that kind of cash, they were permitted to charge their time in the back room on credit cards—*after* obtaining telephone authorization verifying the customer's credit limit. (Emphasis added.)

It was reasonable for the jury to have found that defendants Campione and Collins aided and abetted a Travel Act violation here where credit card approval routinely was secured before the customer was permitted to go to the back room or spend any additional time with a dancer. Moreover, there is sufficient evidence for a jury to reasonably have found that employees of My Friend's Place violated § 1952 by using the interstate telephone to secure the credit card authorization and communicating the approval of the credit card charge to the waitress and/or dancer. The act of communicating the approval facilitated the promotion of the unlawful activity of prostitution offenses, including maintaining a house of prostitution.

## C. Jury Instructions

■■■ The rule of review for jury instructions in this circuit is that "in determining the propriety of instructions they are to be viewed as a whole, and as long as the instructions treat the issues fairly and accurately they will not be interfered with on appeal." *United States v. O'Malley,* 796 F.2d 891, 897 (7th Cir.1986) (citations omitted); *see also Doerr,* 886 F.2d at 960 (view jury instructions as a whole and with common sense to determine if issues are treated fairly and accurately). Defendants claim that it was error for the district judge not to instruct jurors that members of the conspiracy had to agree on *which* two predicate acts would be committed. "To be convicted of a conspiracy to violate

RICO there must be proof that the individual, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes." *United States v. Neapolitan,* 791 F.2d 489, 497 (7th Cir.) (quoting *United States v. Bright,* 630 F.2d 804, 834 (5th Cir.1980)), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). "The natural reading of the statute is that any particular defendant need only agree that he and his co-conspirators will operate an enterprise through the commission of two predicate acts." *Neapolitan,* 791 F.2d at 495 (citing *United States v. Carter,* 721 F.2d 1514, 1529 (11th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984)). There is no language in the statute or in any case in this circuit that requires defendants to agree upon which two predicate acts will be committed.

Defendants argue that "if defendants unilaterally agree to the commission of *different* patterns of racketeering through the enterprise, the objects of their agreements are *different* violations of the RICO statute, [t]hey are not agreeing to the commission of the same crime but of different crimes." Defendants assert that it was error to instruct the jury so as to permit a finding that defendants committed a RICO conspiracy violation if Campione agreed to the commission of predicate acts 1–6 while Collins agreed to 7–12 and Patricelli to 13–19. However, "[u]nder RICO it is irrelevant that each defendant participated in the enterprise's affairs through different and unrelated crimes." *United States v. Melton,* 689 F.2d 679 (7th Cir.1982) (quoting *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313 (7th Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981)). And "[t]he fact that the defendants participated in different predicate acts does not mean that they cannot be convicted of participating in the same RICO conspiracy...." *O'Malley,* 796 F.2d at 895.

> This section of RICO is capable of providing for the linkage in one proceeding of a number of otherwise distinct crimes

and/or conspiracies through the concept of enterprise conspiracy. The government, through the vehicle of the indictment, provides the linking conspiratorial objective of a *specific* RICO violation. The "specific" violation can be broad or narrow depending on the number of predicate crimes within the scope of the agreement that the government chooses to identify.

*Neapolitan,* 791 F.2d at 501. "The government need only prove that the defendant entered into an agreement 'with knowledge that the goal of the conspiracy is the commission of the RICO violation, that is to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity.' " *O'Malley,* 796 F.2d at 896 n. 5 (quoting *Neapolitan,* 791 F.2d at 492).

▮ The basic crime in a RICO conspiracy is conspiracy to "commit the offense of conducting or participating in the affairs of an enterprise through a pattern of racketeering." *Neapolitan,* 791 F.2d at 504. The predicate acts are important elements of the crime and "RICO cannot be viewed as a complete offense distinct from the underlying crimes upon which it is based." *Id.* at 501. But "the goal of the conspiracy is the ultimate commission of one criminal act." *Id.* at 499 n. 5. The defendant need agree only to a single violation of RICO and RICO proscribes any agreement whose object is the conducting of or participation in the affairs of an enterprise through a pattern of racketeering activity. *Id.* at 497.

▮ Here the district court instructed the jurors that the government must prove, "that the defendant knowingly conspired with another person to conduct and participate in the conduct of the affairs of that enterprise, directly or indirectly, through a

pattern of racketeering, namely at least two of the acts alleged in Counts Two through Thirty-two of the indictment." That instruction "specifically required the jury to find that each defendant agreed to the commission of at least two of the predicate acts listed in the indictment," as this circuit in *Neapolitan* found to be sufficient for instructing the jury. *Id.* at 504. The defendant need only agree to the commission of the two predicate acts on behalf of the conspiracy; agreement that the acts will be committed by any of the co-conspirators on behalf of the conspiracy is sufficient. *See id.* at 499 n. 5. Because RICO conspiracy does not require an agreement as to which two predicate acts will be committed, the district court did not err by failing to so instruct the jury.

▮ Defendants also claim that the district court improperly permitted a *Pinkerton* instruction and that the giving of such an instruction resulted in an unwarranted extension of liability since the instructions on the RICO conspiracy charge did not require defendants to agree on which two predicate acts would be committed. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). But we have already determined that it was not error for the jurors to find defendants guilty of the RICO conspiracy count without finding an agreement on which two predicate acts would be committed. As in *Neapolitan,* we said that use of *Pinkerton* instructions in RICO conspiracy cases is not "wrong or improper." *Neapolitan,* 791 F.2d at 505 n. 7.

The instructions challenged here correctly reflected the substance of the holding in the *Pinkerton* case.[7] The instructions also permitted the jurors to exercise discretion in applying the doctrine to each defendant

---

7. Jury instruction 36 reads:

If you find that a defendant is guilty of conspiracy as charged in Count One, you may also find the defendant guilty of a substantive offense as charged in Counts Two through Thirty-two of the indictment, provided that you find that the essential elements of that count as defined in these instructions have been established beyond reasonable doubt, and provided that you also find beyond rea-

sonable doubt, *First,* that the offense defined in the substantive count was committed pursuant to the conspiracy, and *Second,* that the defendant was a member of the conspiracy at the time the substantive offense was committed. Under the conditions just defined, a defendant may be found guilty of a substantive count even though he did not participate in the acts constituting the offense as defined in the substantive count.

on each count.[8] The Supreme Court said in *Pinkerton* that a defendant found guilty of a conspiracy may also be found guilty of substantive offenses committed by a co-conspirator or co-conspirators, in furtherance of the conspiracy, at the time that defendant was a member of the conspiracy, even though that defendant did not participate in the substantive offenses or have any knowledge of them. *United States v. De Luna,* 763 F.2d 897, 918 (8th Cir.) (citing *Pinkerton,* 328 U.S. at 645–48, 66 S.Ct. at 1183–84), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). We have said before that where the instructions properly recite the elements of the *Pinkerton* doctrine and permit the jury discretion in employing the doctrine as to each defendant, the instruction does not result in unwarranted extension of liability where the evidence with respect to the substantive Travel Act counts was sufficient to support convictions when viewed in the light most favorable to the government. *United States v. Caliendo,* 910 F.2d 429, 438–39 (7th Cir.1990). We have already determined that the evidence with respect to the substantive Travel Act counts was sufficient and that the jury was properly instructed on the RICO conspiracy charge. In light of these determinations, defendant's argument with respect to the propriety of the *Pinkerton* instruction fails to persuade us otherwise.

## II.

*Defendant Patricelli*

Defendant Patricelli presents two arguments on appeal. First he argues that the evidence against him was insufficient on each count to establish his guilt beyond a reasonable doubt. Second, he argues that the failure of the district judge to advise him of his constitutional right to testify on his own behalf requires reversal.

8. Instruction number 39 states:
  Each count of the indictment charges the defendant named in that count with having committed a separate offense. You must give separate consideration both to each count and to each defendant. You must consider each count and the evidence relating to it separate

### A. Sufficiency of the Evidence

Defendant's argument focuses on one aspect of proof, that is that the government failed to prove beyond a reasonable doubt Patricelli's agreement to participate in the RICO conspiracy. Conspiracy to violate RICO requires a showing that defendant "was aware of the essential nature and scope of the enterprise and intended to participate in it." *Muskovsky,* 863 F.2d at 1324 (quoting *United States v. Bruun,* 809 F.2d 397, 410 (7th Cir.1987)). While the government must show that there was an agreement between the members of the conspiracy, direct evidence need not be shown; "an agreement can be inferred from the circumstances." *Id.* (quoting *Neapolitan,* 791 F.2d at 501).

The evidence, when viewed in the light most favorable to the government, *id.* at 1322, supports the proposition that the jury could reasonably have found that Patricelli agreed to participate in the conspiracy. Patricelli assisted in the hiring and instruction of dancers and waitresses, and he acted as floor manager by greeting patrons, checking their identification and checking to see if they had patronized My Friend's Place at an earlier date. Patricelli helped to maintain and also used the index card file. The card file contained patron's names, credit card numbers, dates of previous visits and amounts previously charged. He called for authorization on credit card charges, dealt with troublesome customers in the back room and delivered credit card charge slips to NCS for reimbursement. From this evidence a reasonable juror could have found that Patricelli knew the nature and scope of the enterprise and intended to participate in it. Thus we will uphold the jury's verdict of guilt on all counts.

### B. Right to Testify: Failure to Instruct

Defendant Patricelli claims that the trial judge committed reversible error

and apart from every other count. You should return a separate verdict as to each defendant and as to each count. Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to that defendant under any other count.

by not informing the defendants of their constitutional right to testify and not seeking a waiver of the right to testify from defendants. There is no question that defendants have a constitutional right to testify, but we disagree with defendant's attempt to extend this right to impose a duty on the trial judge to inform defendants of their right to testify and take steps to ensure that it is voluntarily waived. "[C]ourts have no affirmative duty to determine whether a defendant's silence is the result of a knowing and voluntary decision not to testify." *Ortega v. O'Leary*, 843 F.2d 258, 261 (7th Cir.), *cert. denied*, 488 U.S. 841, 109 S.Ct. 110, 102 L.Ed.2d 85 (1988). We have attempted to explain why this is so:

> It is primarily the responsibility of the defendant's counsel, not the trial judge, to advise the defendant on whether or not to testify and to explain the tactical advantages and disadvantages of doing so. If a judge deems it necessary to comment on what he or she views as an inadvisable decision in this critical area, then the court should discuss the matter with the defendant's counsel. Discussing the issue directly with the defendant may inappropriately involve the judge in the unique attorney-client relationship, raising possible Sixth Amendment concerns as well as, in this case, the more obvious Fifth Amendment problems.

*United States v. Goodwin*, 770 F.2d 631, 637 (7th Cir.1985), *cert. denied*, 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986).

Defendant does not argue that he expressed a desire to testify which counsel refused to honor. Nor does he argue that counsel failed to inform him of his right to testify. Rather, defendant seeks relief where none can be found. Courts are not obliged to ascertain whether defendant's failure to testify is the result of a knowing and intelligent waiver of that right. *See Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir.1991). Defendant's argument that courts are so obliged, fails.

III.

For the foregoing reasons, we AFFIRM the convictions of all defendants on all counts.