UNITED STATES of America,
Plaintiff–Appellee,

v.

Rodney L. McNEAL, Defendant–
Appellant.

No. 94–2804.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1995.

Decided Feb. 23, 1996.

Daniel S. Alexander (argued), Patrick E. Boyle, Arnold & Alexander, Chicago, IL, for Defendant–Appellant.

Barry Rand Elden, Chief of Appeals, Virginia Kendall (argued), Office of United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Before POSNER, Chief Judge, and MANION and DIANE P. WOOD, Circuit Judges.

MANION, Circuit Judge.

A jury convicted Rodney McNeal of traveling in interstate commerce to facilitate the crime of extortion in violation of the Travel Act, 18 U.S.C. § 1952, and of doing so while using a firearm in violation of 18 U.S.C. § 924(c)(1). McNeal appeals, alleging that (1) the evidence was insufficient to support the conviction, (2) the jury was improperly instructed as to the elements of a Travel Act violation, (3) evidence of guilty pleas from McNeal's codefendants was erroneously admitted, and (4) evidence was admitted in violation of the Fourth and Fifth Amendments. We affirm.

## I. Background

Rodney McNeal and LaCrisha Chanel Jones (Chanel) shared an apartment in Hammond, Indiana. Chanel is McNeal's long-time girlfriend and the mother of Rodney, Jr., and Rodnedra, McNeal's two children. On Monday, December 27, 1993, in retaliation for a sexual tryst with a 16–year-old girl, Chanel absconded with $13,000 of McNeal's money. Chanel had employed this tactic during previous fights to get McNeal's attention and force a reconciliation, and she hoped the same result would occur again.

The money, as it turned out, was not all McNeal's, so he was very anxious to get it back. That same day he called Chanel's mother, Gladys Jones, asking for her help, and then traveled with a friend to Gladys' apartment in Chicago. Chanel was there, but she refused to come out of the bathroom or return the money because she and McNeal had yet to resolve their conflict. Gladys testified that McNeal never threatened her while he was in her apartment, though he did threaten Chanel and only left when Gladys, wielding a baseball bat, threatened to call the police.

McNeal made subsequent calls to Gladys asking for her assistance in getting the money back. He also visited her apartment again, arguing for a time with Chanel, but left at Gladys' request. On Wednesday or Thursday of the same week (December 29 or 30), McNeal again called Gladys, but this time he put an unidentified man on the line who told her that if she did not get Chanel to give the money back, he would "make it rain." Although Gladys testified that McNeal himself never threatened her, she interpreted this statement as a threat to her family and so called in her sons to protect her.

On December 30, McNeal met his friend Marcus Fisher in Chicago and told him what had happened. McNeal got in the car Fisher was driving and from a cellular phone made several calls to Chanel and Gladys asking for the money back. The two men also spent some time at a gas station near Gladys's apartment waiting for Chanel to come outside, but when she did not emerge, they left to pick up Fisher's girlfriend, Melva French,

at her job. The three then went to dinner and discussed the situation. McNeal told them he needed a place to stay and asked for a ride to his apartment in Hammond, Indiana, so he could pick up some of his personal belongings. At the time, McNeal believed Chanel was still at her mother's apartment in Chicago.

At about 8:00 that evening, McNeal, Fisher, and French arrived at McNeal's apartment in Hammond where they unexpectedly found Chanel with her sister Ebony and her sister's friend, Valerie. According to Chanel, she had returned to the apartment knowing that McNeal might also return because she wanted to give back the money and resolve things. McNeal and Chanel immediately began to argue while pushing and shoving each other. At some point in the tussle, McNeal brandished a gun and Chanel said she would return the money. McNeal claims he brandished the gun because Chanel's sister had grabbed a baseball bat and her friend Valerie had a knife or ice pick, but testimony at trial indicated the gun may have been out from the time he entered the apartment. Fisher then joined the fray, breaking up the fight and grabbing the bat.

Chanel told McNeal the money was in the apartment downstairs, but that was not true. With McNeal nearby, Chanel entered the downstairs apartment. Chanel testified that the real reason she went there was to call the police, a tactic she had used before to get back at McNeal. When McNeal discovered this he grabbed her collar and pulled her out of the apartment and into the parking lot. Chanel told her sister Ebony to call the police, but McNeal fired a shot at the ground to dissuade her. McNeal then told Chanel to get into French's car, but she refused because she was scared, either for herself or for her sister and friend who were unfamiliar with Hammond and would be left behind. McNeal proceeded to pistol-whip her across the head and shoulders, breaking her nose and causing her to bleed profusely, and then forced her into the back seat of French's car where he joined her.

McNeal, Chanel, Fisher, and French (driving) travelled from Hammond to Chicago,

stopping along the way for gas and tissues for Chanel's nose. Chanel never left the car for fear that McNeal would harm her. In Chicago, McNeal instructed French to rent a room for two nights at the Ramada Inn. McNeal then took Chanel into the room and put her on the bed and Fisher and French left. Chanel testified that McNeal put the gun on the nightstand and later even fell asleep, giving her the opportunity to grab the gun and escape or call the police, but she did nothing. She also testified that during the night they made up and had sex, Chanel initiating.

That night McNeal made several phone calls to Gladys, Chanel's mother. During one call, McNeal had Chanel tell her mother where the money was hidden. Chanel also told her mother that she was hurt and bleeding and needed to go to the hospital. Gladys testified that her daughter sounded weak on the phone and at times during the conversation stopped speaking for two or three seconds, as if she had passed out. McNeal then gave Gladys a pager number to call to have someone pick up the money. In a subsequent call that evening, McNeal told Gladys that when he got the money he would take her daughter to the hospital.

There appears to have been a snag in arranging the pick-up. McNeal called Gladys early the next morning (on December 31) and learned that the money had still not been retrieved. During the conversation, Gladys asked McNeal to take Chanel to the hospital or at least let her walk there. He responded that he would not take Chanel to the hospital until he got his money back and added that Chanel was unable to walk anyway. The money was later retrieved from Gladys, after which McNeal dropped Chanel off at the hospital and called Gladys to tell her where Chanel was. Despite all this, Gladys testified at trial that she never thought McNeal was threatening her, that she was always willing to return the money, and that she would have done so even if Chanel had not been with him. She also submitted a post-trial affidavit averring that McNeal had never threatened her or Chanel during any of their conversations and that

she had planned to give the money back regardless of the situation with her daughter.

Early in the morning of December 31, 1993, the day the money was retrieved, the FBI learned that McNeal, Fisher, and French were involved in a possible kidnapping for ransom and that French's car had been used. An FBI agent met with Chanel at the hospital and learned that McNeal had injured her and that he was armed. FBI agents then staked out French's apartment where French's car was parked and where they suspected McNeal, Fisher, and French might be. Fisher soon emerged and was promptly arrested. He told the agents that McNeal was inside. Two agents proceeded to the apartment, knocked twice and identified themselves. Hearing no response, they kicked down the door and entered the apartment. What happened next is not exactly clear from the record. The agents did not immediately search the apartment because they were not wearing ballistic vests and so feared for their safety. Instead, one of the agents went to call a canine unit. When he returned, however, the other agent had arrested McNeal. The agents did not have an arrest or search warrant.

McNeal was not informed of his rights immediately upon arrest. The government claims that the agents did not interview McNeal regarding the case until he had been informed of his rights later in the examination room at the FBI office. McNeal disputes this, maintaining that FBI agents questioned him prior to advising him of his rights and even told him to tell them everything that had happened because "it will help you in court." McNeal refused to sign the advice of rights form but, according to the agents, proceeded to talk anyway. McNeal denies this as well. He claims the agents put down a false time on the form to create the impression that he had been read his rights before being interviewed.

On March 17, 1994, a federal grand jury returned a four-count superseding indictment against McNeal for conspiracy, kidnapping, interstate travel in aid of extortion, and use of a gun in relation to a crime of violence. Count one charged McNeal with conspiring to commit kidnapping and interstate travel in

aid of extortion, in violation of 18 U.S.C. § 371. Count two charged him with kidnapping in violation of 18 U.S.C. §§ 1201(a)(1) and 1202. Count three charged him with traveling in interstate commerce to facilitate the crime of extortion as prohibited by Illinois law, in violation of the Travel Act, 18 U.S.C. § 1952. Lastly, count four charged McNeal with using a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c). Fisher and French were similarly charged but they entered into a plea agreement in which they agreed to cooperate with the government.

Claiming violations of his Fourth and Fifth Amendment rights, McNeal moved to suppress all the evidence obtained as a result of the warrantless search and the questioning. The district court ruled that McNeal had no standing under the Fourth Amendment to challenge the search because he was not an overnight guest and thus did not have a constitutionally protected privacy interest in the apartment. The court also ruled that, regardless of standing, the search was justified due to exigent circumstances. As for the allegedly improper questioning, the court heard both renditions of what happened at an evidentiary hearing and, finding the agents more credible than McNeal, ruled that McNeal had not been deprived of his Fifth Amendment rights. Thus, the court declined to suppress the evidence and the case went to trial.

The jury found McNeal guilty of committing extortion in violation of the Travel Act (count three) and of using a firearm in connection with a crime of violence (count four), but was unable to reach a verdict on the conspiracy and kidnapping counts. The court then sentenced McNeal to 60 months for each count, to run consecutively, for a total term of 120 months.

## II. Analysis

### A. Sufficiency of the Evidence

■ McNeal claims that the evidence cannot support his conviction under the Travel Act. The Travel Act provides in relevant part that "[w]hoever travels in interstate . . . commerce . . . with intent to . . . commit any crime of violence to further any unlawful activity . . . and thereafter performs or attempts to perform" such a crime "shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life." 18 U.S.C. § 1952(a). An "unlawful activity" is defined to include, *inter alia*, "extortion . . . in violation of the laws of the State in which committed or of the United States." *Id.* § 1952(b)(2).

Virtually all of the circuits have concluded that in a Travel Act prosecution, in addition to showing that a defendant made use of, or aided and abetted another in making use of, a facility in interstate commerce to promote an unlawful activity (here extortion), the government must also show that the activity was unlawful according to the elements of a specific state criminal statute. *United States v. Jones*, 909 F.2d 533, 536–37 (D.C.Cir.1990) (reviewing cases). In *United States v. Zemater*, 501 F.2d 540, 544 (7th Cir.1974), we noted that this result appears to be dictated by the "plain language" of the Travel Act, however our later cases have taken the position that the Travel Act "does not incorporate state law as part of the federal offense" and thus "violation of the Act does not require proof of a violation of state law." *United States v. Campione*, 942 F.2d 429, 434 (7th Cir.1991); *United States v. Doerr*, 886 F.2d 944, 960–61 (7th Cir.1989).

Believing it would help his plight, McNeal urges us to reexamine our position. Apart from the consensus of most of the other circuits, there are probably good reasons for doing so (sensitivity to the values of federalism and fair warning, to mention just two), but because McNeal's conviction would stand even if proof of each element of the underlying state offense were required, such a reexamination is unnecessary.

The indictment for extortion under the Travel Act referenced the Illinois crime of intimidation, which Illinois law defines as follows:

(a) A person commits intimidation when, with intent to cause another to perform or omit the performance of any act, he communicates to another, whether in person, by telephone or by mail, a threat to per-

form without lawful authority any of the following acts:

    (1) Inflict physical harm on the person threatened or any other person or on property; or

    (2) Subject any person to physical confinement or restraint; or

    (3) Commit any criminal offense; or . . . .

Ill.Comp.Stat. ch. 720, 5/12–6 (1995).

As the Appellate Court of Illinois has stated on several occasions, the purpose of this statute is "to prohibit the making of threats specifically intending to compel a person to act against his will." *People v. Verkruysse*, 261 Ill.App.3d 972, 203 Ill.Dec. 322, 324, 639 N.E.2d 881, 883 (1994); *People v. Maldonado*, 247 Ill.App.3d 149, 187 Ill.Dec. 28, 31, 617 N.E.2d 236, 239 (1993). The Appellate Court in *Verkruysse* further explained: "The gravamen of the offense is improper influence on another. To determine whether a defendant 'threatened' someone under the meaning of the statute, the jury must examine the defendant's words and actions to determine whether they had a reasonable tendency under the circumstances to place another in fear that the threat-maker will perform the threatened act." 203 Ill.Dec. at 324, 639 N.E.2d at 883 (internal quotation marks and citations omitted).

McNeal maintains that the government failed to prove that he committed the crime of intimidation under Illinois law. His argument is basically this: Yes, he committed an egregious domestic battery, but there was no credible evidence of intimidation, either against Chanel or her mother Gladys. First of all, he had a right to the money; no one denies that. Moreover, both Chanel and her mother repeatedly testified that they were willing and always intended to return the money. They also testified that McNeal did not threaten them personally. Therefore, McNeal did not intimidate Chanel or Gladys into acting against her will and so did not commit the crime of intimidation. "Rather," McNeal continues, "the facts of this case show a very young and immature couple who were acting out their emotions in a familiar pattern." Chanel took McNeal's money to get his attention and force a reconciliation, as she had done before, and McNeal came look-

ing for Chanel and his money. The only problem was that this time things got out of hand and Chanel got hurt. Though the battery is inexcusable, McNeal concludes, his actions were not enough to constitute the crime of intimidation.

■ McNeal carries a heavy burden in attempting to challenge his conviction on the basis of insufficient evidence. An appeal is not a second trial. "We review the evidence in the light most favorable to the government, and reverse only if we determine that no rational jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Rahman*, 34 F.3d 1331, 1337 (7th Cir.1994). Thus we need not sift through and weigh every point and counterpoint raised at trial or in Gladys' post-trial affidavit. It is enough for us to find credible testimony and evidence upon which a reasonable jury could base a guilty verdict.

There is no question that McNeal attempted (in the words of the intimidation statute) "to cause another to perform . . . [an] act." Ill.Comp.Stat. ch. 720, 5/12–6. McNeal's actions were intended to induce Chanel and Gladys to return his money. The critical question is whether there was any credible evidence that McNeal ever threatened to hurt or physically confine someone, or otherwise commit a criminal act, if his demands were not met. The record confirms there was plenty; two examples suffice.

Gladys testified that on December 29 or 30, McNeal called her and put an unidentified man on the line who said that if she "didn't get [her] daughter out and give him his money back that he would 'make it rain.'" Whatever the exact meaning of that phrase (it certainly had nothing to do with the weather), the context clearly suggests it was a threat. Gladys interpreted it so and called in her sons for protection. McNeal attempts to diminish this by pointing to cross-examination testimony from Gladys opining that she didn't think McNeal himself was threatening her or that he would kill Chanel. But viewing the conversation in the light of all the facts, a jury reasonably could have disagreed with Gladys' assessment and instead viewed those words as a clear threat

by McNeal, through an agent, to inflict physical harm on Gladys or her family if she and Chanel did not comply with his demands. Indeed, that is the most reasonable interpretation.

Gladys also testified that in a telephone conversation early in the morning of December 31, while McNeal and an ailing Chanel were at the hotel, Gladys asked McNeal to take her daughter to the hospital, or at least to let her walk there. Gladys had already spoken with Chanel the night before and learned that she was seriously injured and needed medical treatment. McNeal was present during this earlier conversation (he took the phone away from Chanel in the middle of it) and so knew that Gladys understood her daughter's physical plight. It is significant, then, that McNeal responded to Gladys' plaintive pleadings by stating that he would not take her daughter to the hospital until she returned his money. Without doubt, this was an act of intimidation under Illinois law. Accordingly, even assuming the underlying state intimidation offense had to be proven, there was ample evidence to support McNeal's conviction under the Travel Act.

■ McNeal also claims there was insufficient proof that his interstate travel was more than fortuitous or incidental to the extortion. Thus, he argues, there was no federal jurisdiction under the Travel Act.

■ It is well established that "in a Travel Act prosecution the interstate travel or use must relate significantly, rather than incidentally or minimally, to the illegal activity." *United States v. Raineri,* 670 F.2d 702, 717 (7th Cir.1982); *Campione,* 942 F.2d at 434–35. The federal courts must guard against unduly expansive interpretations of the Travel Act that threaten to "alter sensitive federal-state relationships" or "transform relatively minor state offenses into federal felonies." *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). But here the interstate travel was far from incidental. McNeal savagely beat Chanel, forced her into a car and then traveled across state lines to a hotel where he intimidated Gladys into returning his money. The hotel itself—reached only through interstate travel—served as a headquarters for coordinating many of the acts composing the extortion. There McNeal made critical phone calls, held Chanel captive, and met with his partners in crime, all within a reasonable distance from Gladys' apartment where the money was being held. True, it would probably have been possible to use a hotel in Indiana to carry out the scheme. But McNeal chose to use a hotel in another state as his base of operation. "The interstate use need not be indispensable to the illegal activity, 'it is enough that the use facilitates the illegal activity.'" *Campione,* 942 F.2d at 435 (citing *U.S. v. Muskovsky,* 863 F.2d 1319, 1327 (7th Cir. 1988)). McNeal's use of the Chicago hotel was key to his success in getting the money back. Thus the interstate travel was significantly related to the extortion for which McNeal was convicted.

## B. Jury Instructions

■ McNeal attacks the jury instructions on the Travel Act count because they supposedly allowed the jury to convict him for extortion under the Travel Act without first finding that he met the elements of intimidation under Illinois law. He claims the jury was left without any clear definition of what conduct constituted the offense underlying the Travel Act charge.

■ Composing jury instructions is not a precise science; many formulations can be adequate. We do not overturn convictions merely because a word or two more or less theoretically could have improved the defendant's chances of acquittal. *See United States v. Briscoe,* 896 F.2d 1476, 1512 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990) (defendant is not entitled to have his particular instruction presented to the jury); *cf. United States v. Caliendo,* 910 F.2d 429, 437 (7th Cir.1990) (argument that a separate trial would have improved chance of acquittal insufficient to overturn denial of motion to sever). Our deferential review on appeal is simply to ensure that the jury "instructions as a whole treated the issues in the case fairly and accurately." *United States v. Smith,* 995 F.2d 662, 669–670 (7th Cir.1993). Here they

unquestionably did. The instructions indicated that to convict McNeal of violating the Travel Act the jury had to find that McNeal traveled in interstate commerce, that he did so with the intent to carry out an extortion, and that he in fact carried on the extortion or at least attempted to do so. The judge then defined interstate commerce and explained that "[e]xtortion includes the crime of intimidation" under Illinois law, which occurs when a person "with intent to cause another to perform any act, communicates to any other person a threat to inflict physical harm on the person threatened, or any other person, or to subject any person to physical restraints." This definition of intimidation was largely a direct quote from the Illinois intimidation statute and thus is accurate.

Nevertheless, McNeal complains that the instructions did not clearly tell the jury that it first had to find that he had violated the Illinois law against intimidation before it could convict him under the Travel Act. We have already explained that the law of this circuit does not yet require such a finding. But even if it did, the jury instructions were still adequate. McNeal was charged with extortion under the Travel Act, which the jury instructions defined solely in terms of the Illinois crime of intimidation; no other definition of extortion was given. It is reasonable to assume, therefore, that the jury used the only definition of extortion before it in reaching its verdict. *Cf. Chalmers v. Mitchell,* 73 F.3d 1262, 1266 (2d Cir. (N.Y. 1996)) ("We assume the jury applies the instructions it is given."). We hold that the jury instructions fairly and accurately conveyed to the jury the issues before it and thus were not defective.

*C. Evidence of Codefendants' Guilty Pleas*

■ McNeal asserts that the district court erred in denying his motion in limine to exclude statements by Fisher and French indicating they had pleaded guilty to violating the Travel Act. He claims the jury could have improperly inferred that he was guilty based solely on his codefendants' pleas. The law, however, is well settled in this circuit that "on direct examination, the prosecutor may elicit testimony regarding the witness'

plea agreement and actually introduce the plea agreement into evidence." *United States v. Mealy,* 851 F.2d 890, 899 (7th Cir. 1988); *United States v. Alex Janows & Co.,* 2 F.3d 716, 719 (7th Cir.1993). As we explained in *United States v. LeFevour,* 798 F.2d 977, 983–84 (7th Cir.1986), one reason for this is that a witness who has entered a guilty plea may need to explain the circumstances surrounding his testimony in order to remain credible. For "without knowledge of the immunity agreements, the jury might wonder why these witnesses were publicly admitting the commission of crimes" and thus doubt their credibility. *Id.* at 984. The district court did not abuse its discretion in allowing the jury to hear such statements.

*D. Fourth and Fifth Amendment Claims*

■ McNeal contends that his Fourth Amendment rights were violated when FBI agents entered French's apartment and arrested him without a warrant. It is questionable whether McNeal even has standing to raise this issue. The "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). McNeal was temporarily in the apartment by permission of another (Fisher) who in turn had permission to be there from the actual tenant (French), and McNeal was not planning to stay long. The district court held that this was not enough to create in McNeal a legitimate expectation of privacy for purposes of the Fourth Amendment. Whether the guest of a guest has standing to invoke the Fourth Amendment against a warrantless entry of a residence is an interesting issue, but deciding it is unnecessary here. Even if McNeal has standing, we agree with the district court's ruling that the warrantless entry was justified because of exigent circumstances. *See Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) ("[W]arrantless entry by criminal law enforcement officials may be legal where there is a compelling need for official action and no time to secure a warrant."); *Warden v. Hayden,* 387 U.S. 294,

298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967) (exigent circumstances justify warrantless entry of house to search for armed robbery suspect and weapons because delay would endanger lives of officers and citizens).

Based on seemingly credible statements from a victim, who had been seriously injured, McNeal was suspected of kidnapping, assault, and extortion, all grave or violent offenses. From their conversation with Chanel, the agents also had good reason to believe that McNeal was armed and therefore potentially dangerous. When the agents arrested Fisher they learned that McNeal was inside the apartment. The apartment did not belong to McNeal (or Fisher, for that matter) so his stay there would probably be brief. Up to this point, with each move McNeal had issued more threats or used his gun to intimidate or injure. The police had reason to believe that another move would likely threaten the safety of others, including law enforcement officers who were now on the scene. Delay under these circumstances could have provided McNeal with an opportunity to flee the apartment and, in his flight, possibly pose a further threat to public safety. Delay would also have afforded McNeal a chance to hide or transfer the gun, which was not only a key piece of evidence, but a continuing threat if later retrieved by McNeal or used by someone else. Taken together, these facts support the district court's finding of exigent circumstances. *See United States v. Madewell,* 917 F.2d 301, 304 (7th Cir.1990). The court's decision to deny the motion to suppress was not clearly erroneous. *United States v. Edwards,* 898 F.2d 1273, 1276 (7th Cir.1990) (denial of motion to suppress evidence reviewed on appeal for clear error).

■■■■ Finally, McNeal claims that in violation of the strictures established in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), federal agents questioned him before advising him of his Fifth Amendment rights. As detailed above, McNeal made this allegation at the suppression hearing and the agents flatly denied it. Which rendition of the facts to believe, therefore, turns on the credibility of the witnesses.

District courts are due "particular deference" when they make credibility determinations at suppression hearings because of their unique opportunity to hear testimony and observe the demeanor of the witnesses. *United States v. Sullivan,* 903 F.2d 1093, 1096 (7th Cir.1990). Here the district court conducted an evidentiary hearing, heard both sides of the story, and found the government agents more credible than McNeal. We find nothing implausible in the agents' story and so have no basis for upsetting this determination.

### III. Conclusion

For the foregoing reasons McNeal's conviction is

AFFIRMED.