91 F.3d 147
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Marcelino SANCHEZ, Defendant-Appellant.
 No. 95-3242.
 United States Court of Appeals, Seventh Circuit.
 Argued March 26, 1996.
Decided July 15, 1996.
 
 Before ESCHBACH, MANION, and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Marcelino Sanchez was convicted of two counts of possessing cocaine with the intent to distribute and sentenced to 136 months imprisonment and four years of supervised release. He appeals alleging (1) the police lacked probable cause to support a warrantless arrest and seizure, (2) the evidence was insufficient to support the conviction, and (3) he was improperly sentenced. We affirm.
 
 I.
 
 2
 In May 1993, a confidential informant ("CI") working with the Drug Enforcement Administration ("DEA") began to engage Sanchez in recorded conversations concerning the purchase of cocaine. The CI posed as a cocaine broker interested in purchasing cocaine on consignment to resell to her purchasers. Sixteen separate telephone conversations between Sanchez and the CI regarding the drug buy were eventually recorded.
 
 
 3
 On May 4, 1993, the CI called and asked if "anything [had] come in yet," referring to the cocaine. Sanchez responded that his source had told him that it would arrive "late last night or today." Since nothing had yet arrived, Sanchez said he would not have anything for her until later that day or the next. After an unsuccessful attempt to meet the next day, the CI, equipped with a transmitter and recording device, met with Sanchez on May 6th to discuss the drug buy. Although DEA agents hoped Sanchez would bring the cocaine to this meeting, he did not. Instead, he and the CI drove around in his car and talked. Sanchez said his source had called him the night before to say the cocaine had come in, but he had not received the message until that morning. The CI and Sanchez then discussed a two-kilo buy. Sanchez said the price of cocaine had "gone down to 25," meaning $25,000, but that he would sell it to her for only $24,000 per kilogram. The defendant also said he could supply "four to five [kilograms of cocaine] per week." Later that day, following the advice of DEA agents, the CI told Sanchez that her buyer was getting anxious and might not wait. And in another conversation, the CI, again under the direction of DEA agents, told Sanchez that her buyer had left for the day because she had already acquired cocaine from another source.
 
 
 4
 The CI and Sanchez met again the next day, Friday, May 7th, to discuss the deal. The CI told Sanchez her buyer wanted two kilograms of cocaine. Sanchez assured the CI he could come through: "[I]f they want five, ten per week, whatever--whatever she wants." The CI advised Sanchez that the buy would have to wait until at least May 10th, the following Monday. Between May 7th and May 13th, the day of the arrest, the CI had additional conversations with Sanchez to check on the availability of the cocaine. These conversations were not recorded.
 
 
 5
 On May 13, 1994, the DEA recorded seven conversations between the CI and Sanchez. At 11:10 a.m., the CI and Sanchez met in the parking lot of a food store and discussed whether the cocaine buy was for one or two kilograms. Despite the CI's repeated requests for two kilograms, Sanchez claimed he thought the CI's buyer wanted only one kilogram and so the night before "gave another guy two [kilograms]." Sanchez told the CI he had one kilogram available and could bring the other later. He reassured her he would have set aside two kilograms for her had he known better and then promised to contact one of his sources to obtain the additional kilogram of cocaine. The CI responded that she would wait to hear from him about the remaining kilogram. In the course of the conversation, Sanchez also complained about getting "shorted" three thousand dollars on another deal.
 
 
 6
 Under surveillance, Sanchez returned to his house where he was visited by another man. After the man left, Sanchez emerged, entered his car, and headed in the direction of the CI's house. In the interim, Sanchez had four monitored and recorded telephone conversations with the CI, keeping her abreast of the availability of the cocaine. During the second of these conversations, Sanchez said it would take one or two hours for his source to obtain the second kilogram and that it would be better if she immediately took the one he already had available and waited for the other to arrive. In the third conversation, the CI agreed to talk to her buyer about taking delivery of one kilogram now and the other later. In their final conversation, under instructions from a DEA agent, the CI told Sanchez to deliver the one kilogram he had. Sanchez responded that he was on his way to her house.
 
 
 7
 On this information, DEA agents intercepted Sanchez in his car en route to deliver the cocaine. Under the pretext that Sanchez's car was stolen, the agents obtained permission from Sanchez to search the car. On the floorboard in the front passenger side, the agents found a brown paper bag. Inside was a plastic bag wrapped with brown duct tape containing what was later determined to be a kilogram of cocaine. Sanchez was then arrested. When questioned, Sanchez initially dissembled, claiming that someone put the cocaine in his car, but then admitted he was headed to deliver it to a girl named Gina (the first name of the CI). He explained he had been "fronted" the cocaine and still owed $23,000 on it. He also admitted he had more cocaine at his house and gave written consent to search his house. This search revealed 266.9 grams of cocaine and about 75 grams of marijuana.
 
 
 8
 In a post-arrest statement Sanchez stated that in addition to the cocaine he obtained for the CI, he had also obtained another kilogram a month earlier from his source, a man Sanchez identified as Alejandro Alcantar, the same man DEA agents observed at Sanchez's house earlier that day. Telephone records introduced at trial revealed frequent contacts between Alcantar and Sanchez while Sanchez was negotiating the cocaine buy with the CI.
 
 
 9
 On June 11, 1993, a federal grand jury indicted Sanchez for (count one) knowingly and intentionally possessing with intent to distribute approximately 1064 grams of a mixture containing cocaine on May 13, 1993, and for (count two) knowingly and intentionally possessing an additional 266.9 grams of cocaine that same day. After unsuccessfully moving to quash his arrest and suppress the evidence seized from his car, Sanchez was convicted by a jury on both counts. On September 8, 1995, the district court sentenced Sanchez to 136 months imprisonment and four years of supervised release.
 
 II.
 A. Probable Cause to Arrest and Search
 
 10
 Sanchez contends the district court erroneously found that probable cause existed to arrest him and search his car because considering the totality of the circumstances no reasonably trustworthy information indicated he was a drug dealer. Of course, to accept this desperate assertion one would have to conclude that all of Sanchez's recorded negotiations for the drug sales were a ruse to preserve a social relationship he allegedly had with Gina, the CI. If it was a ruse, Sanchez put on a pretty good act. DEA agents learned Sanchez would be delivering cocaine that day from the CI and from recorded conversations between Sanchez and the CI. Consistent with the CI's report and the intercepted conversations, Sanchez set out for the CI's house at the appointed time. On those facts, DEA agents stopped Sanchez's car. Once stopped, Sanchez gave permission to search his car which revealed a kilogram of cocaine. Only then was Sanchez arrested. Again with permission, agents searched Sanchez's house and found additional drugs. The district court found that the totality of the circumstances supported a finding of probable cause. Illinois v. Gates, 462 U.S. 213, 232-33 (1983). We agree. Sanchez's own words indicated he was a drug dealer interested in selling the CI cocaine on the day of the arrest, and his actions that day were in strict conformity with his words. That was more than enough for probable cause. He cannot now distance himself from this activity by defining it as untrustworthy. There was no error in the district court's determination. Ornelas v. United States, 116 S.Ct. 1657, 1662 (1996) (de novo review on appeal for district court's probable cause determinations).
 
 B. Sufficiency of the Evidence
 
 11
 Sanchez's principal argument on appeal is that he was entrapped through the sexual wiles of an attractive CI. As Sanchez once put it: "[S]he's not an ugly woman, and she's young, and I'm a [married] man and I didn't know what was going to happen." Sanchez paints himself as a helpless man lured into a drug deal by the "not ugly" CI's amorous enticements. Supposedly in anticipation of her affection, Sanchez not only obtained drugs for her but also bragged of drug deals past and present, which he now claims were nothing more than male puffery. Cast in this light, Sanchez maintains that a reasonable jury could only conclude that he was unjustly entrapped.
 
 
 12
 The standard of review for overturning verdicts on appeal is steep: "[A] verdict will withstand a sufficiency of the evidence challenge unless there is no evidence from which the jury can find guilt beyond a reasonable doubt." United States v. Tilmon, 19 F.3d 1221, 1229 (7th Cir.1994). An entrapment defense entails two inquiries: (1) whether the government offered an inducement to commit the crime, and (2) whether the defendant lacked a predisposition to do so. United States v. Akinsava, 53 F.3d 852, 858 (7th Cir.1995). The government notes that the only evidence of an actual romance between Sanchez and the CI came from Sanchez's own testimony at trial. None of the tapes reveals romance, and no agent observed any sort of physical, much less affectionate, contact between the two. Nor at trial could Sanchez specify a single place where he and the CI had conducted their affair. Still, that is not dispositive. Through the CI the government repeatedly offered to buy cocaine. Arguably that constitutes enough of an "inducement" for purposes of an entrapment defense. No matter: Sanchez's own statements and actions evince an independent predisposition to deal drugs. Sanchez bragged--and even complained--about other drug deals and, as the government notes, was enough of a player that his supplier fronted him the cocaine, no small thing at roughly $25,000 a kilogram. Further, Sanchez had a substantial supply of additional drugs back at his house, evidence that Sanchez was a drug dealer with deals beyond this one. There was nothing unreasonable about the jury rejecting Sanchez's entrapment defense.
 
 
 13
 Nor can it plausibly be argued there was insufficient evidence of Sanchez's guilt. On the way to an arranged (though pretextual) drug deal, Sanchez was arrested with about a kilogram of cocaine. A search of his house revealed another 266.9 grams of cocaine as well as $1500 cash and a loaded handgun. These irrefutable facts establish Sanchez's guilt.
 
 C. Sanchez's Sentence
 
 14
 At sentencing Sanchez was held responsible for (1) the cocaine seized from defendant's car and house (1.2 kilos); (2) 75 grams of marijuana found at his house; (3) the kilogram of cocaine defendant had promised the informant; (4) two kilograms of cocaine defendant admitted on tape to having delivered to another customer; and (5) one kilogram defendant admitted to agents following arrest that he had obtained from his source, Alcantar. The four additional kilograms of cocaine seized as evidence served to raise defendant's offense level from 28 to 32.
 
 
 15
 Sanchez argues that he was not reasonably capable of delivering the second kilogram of cocaine to the CI given the difficulty he experienced obtaining the first. He also maintains that his admissions to the CI and the DEA agents of other drugs sales were mere idle boasts. Finally Sanchez contends that the evidence at most shows a willingness to sell one kilogram of cocaine and that but for the CI's insistence he never would have agreed to sell two.
 
 
 16
 The burden of proof at sentencing is substantially less than at trial. The government must prove facts underlying a sentencing determination only by a preponderance of the evidence. United States v. Linnear, 40 F.3d 215, 218 (7th Cir.1991). On appeal our review is deferential. We inspect the district court's findings only for clear error. United States v. Robinson, 30 F.3d 774, 785 (7th Cir.1994).
 
 
 17
 Under the Sentencing Guidelines, the weight of drugs under negotiation in an uncompleted distribution can be used to calculate the relevant amount for sentencing, provided that amounts the defendant did not intend to produce or did not have the reasonable capacity to produce are not included. USSG § 2D1.1, Application Note 12. Sanchez argues he was not reasonably capable of delivering another kilogram of cocaine to the CI and that his comments to the CI and DEA agents about obtaining or selling three additional kilograms of cocaine were mere bluster.
 
 
 18
 At sentencing the district judge was essentially in the position of evaluating the credibility of two sets of contradictory Sanchez statements. On the one hand, on May 13, 1993 in taped conversations Sanchez admitted to the CI that in addition to the kilogram of cocaine he intended to deliver immediately, he could obtain another kilogram for her later that day. He also told the CI that he had delivered two kilograms to "another guy" the night before. After his arrest, Sanchez confessed to obtaining still another kilogram from his source, Alcantar, a month earlier. These statements were not so incredible as Sanchez suggests. It is undisputed that Sanchez was arrested attempting to deliver one kilogram of cocaine and that another fifth was seized at his home. This bolsters the plausibility of his admissions. It is reasonable to assume that a dealer caught with 1.2 kilograms of cocaine could have previously possessed and sold two or three additional kilograms on separate occasions; the quantities are not disproportionate. And it is not implausible that Sanchez would have previously obtained cocaine from Alcantar given that he was with Sanchez, perhaps delivering cocaine, immediately prior to the arrest.
 
 
 19
 On the other hand, with his freedom on the line at trial, Sanchez told a story of romantic entrapment inducing brash accounts of drug deals past and promises of big deals in the future. The jury rejected this story when the government had the burden of showing guilt beyond a reasonable doubt. We see no reason why the district court should have accepted it at sentencing where the government's burden was only preponderance of the evidence. Moreover, determining which "Sanchez" to believe--the Sanchez pre-arrest or the Sanchez at trial and at sentencing--is basically a credibility determination. District courts are due "particular deference" in these matters "because of their unique opportunity to hear testimony and observe the demeanor of the witnesses." United States v. McNeal, 77 F.3d 938, 946 (7th Cir.1996). At trial the district court heard Sanchez's tape-recorded, pre-arrest admissions as well as his testimony on the witness stand. Having reviewed both, we find no error in the district court's decision to believe his admissions before arrest and to sentence him accordingly. All the facts in the record are consistent with the conclusion that Sanchez was an active drug dealer and that the sentence imposed by the district court was proper.
 
 
 20
 AFFIRMED.