In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 11-3179, 11-3410, 11-3493, 11-3615,
11-3874, 11-3886, 12-1141, 12-1804, & 13-1370

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LUIS GARCIA, *et al.*,

*Defendants-Appellants.*

---

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 CR 746 — **Charles R. Norgle**, *Judge.*

---

ARGUED DECEMBER 5, 2013 — DECIDED JUNE 13, 2014

---

Before WOOD, *Chief Judge*, and SYKES and TINDER, *Circuit Judges*.

WOOD, *Chief Judge*. This extensive criminal prosecution arises out of the operations of the Latin Kings street gang in Chicago from 2000 to 2008. Fifteen highly placed gang leaders were charged with violations of the Racketeer Influenced and Corrupt Organizations (RICO) statute, as well as the commission of other crimes. Nine of those defendants have

joined in the present appeals: Luis Garcia, Felipe Zamora, Fernando King, Samuel Gutierrez, Javier Ramirez, Jose Guzman, Augustin Zambrano, Alfonso Chavez, and Vicente Garcia. We find no reversible error in either the convictions or the sentences for defendants Luis Garcia, King, Ramirez, Guzman, Zambrano, Chavez, and Vicente Garcia. Nor do we find any error in the convictions of Zamora and Gutierrez; the sentences for the latter two defendants, however, must be revisited.

## I

### A

The Almighty Latin Kings Nation is a notorious street gang in Chicago. During the time covered by the indictment, the Latin Kings carried out a racketeering conspiracy involving murder, attempted murder, aggravated assault, extortion, and drug trafficking. This particular case focuses on the gang's activities in Chicago's Little Village neighborhood.

The gang operated under a constitution that set forth an elaborate governing hierarchy. At the summit stood La Corona (The Crown), the title the Latin Kings chose for their highest ranking officers nationwide. According to the constitution, Coronas ensured that officers complied with gang rules, administered the gang's rules when needed, and gave final approval to all such rules. Defendant Zambrano occupied the post of Corona during the years 2000 to 2008. According to the government, Zambrano was the only active Corona in the gang nationwide during that period.

Immediately below the Corona were the Supreme Regional Incas. Each Supreme Regional Inca oversaw operations in all regions within his designated geographic area,

implemented gang rules, ensured punishment when the rules were violated, and ordered retaliatory strikes against rival gangs. Defendant King was a Supreme Regional Inca from 2007 to 2008, and defendant Vicente Garcia took over King's post in 2008.

Under the Supreme Regional Inca were a series of Regional Incas, who managed operations in smaller territories. Defendants Zamora, Vicente Garcia, King, and cooperating witness Milton Shanna all held at one time or another the rank of Regional Inca. Each region was further divided into a number of sections; each section was under the control of someone called the Section Inca or just the Inca. The Regional Incas formed a crucial link between the gang's top leaders and its street-level managers and foot-soldiers. Shanna, for example, was responsible for distributing cocaine to and later collecting the sales proceeds from the Section Incas in his region, under the orders of then-Supreme Regional Inca Vicente Garcia. Section Incas provided a steady flow of information to the Regional Incas; that information then made its way up the gang's chain of command. The Regional Incas also set rules for their areas. For example, while serving as a Regional Inca, King wrote what came to be known as the Little Village Rules, which, among other things, required the Latin Kings to maintain an armed presence ("mandatory bust-out") every Thursday through Sunday from 10 p.m. to 3 a.m.

Other gang officers, called the Regional Enforcers, reported to the Regional Incas. Defendant Guzman and cooperating witnesses Ruben Caquias and Shanna spent some time as Regional Enforcers. As the title suggests, Regional Enforcers ensured compliance with gang rules and meted

out punishment against rule-breakers. For example, they patrolled gang territory during mandatory bust-outs and administered timed beatings (known as violations) when gang rules were broken. If another gang member was assigned to inflict the "violation" on someone, the Regional Enforcers watched to be sure that the beating was conducted properly.

The Section Incas (or simply Incas) were leaders of street sections, also called "branches" or "chapters." Defendants Chavez (after October 2007), Luis Garcia, Gutierrez, and Ramirez, along with cooperating witnesses Caquias and Shanna, held this position for at least part of the relevant period. Sections were relatively small: most contained about 25 members. Incas carried out directives from those above them in the hierarchy. They ensured that the proper armed presence was maintained when required; they remitted about $200 per week from the gang's cocaine business to their superiors; and they carried out mandatory retaliatory shootings within 48 hours whenever a Latin King in a nearby neighborhood was shot by a rival. The Inca had a sectional "Casique" who served as second-in-command and as the local enforcer. Under gang rules, an Inca was fully responsible for the actions of his subordinates and would be "violated" along with the offender if one of his street-level subordinates broke the rules.

B

Although it would be impossible in a reasonable space to recount all of the gang's activities from 2000 to 2008, that is fortunately unnecessary. At trial, the government focused on a number of specific incidents, which we summarize here. We include further details where necessary below, as we discuss the individual defendants' appeals. Broadly speaking,

the criminal activities fell into four categories: murder (including attempted murder and indiscriminate shootings); drug distribution; extortion; and violent punishments of disobedient gang members. Examples of each will suffice.

*Murders and Attempted Murders.* Testimony at the trial revealed that Latin Kings regularly shot rival gang members on the orders of gang superiors; they used the terms "burns" and "missions" to describe these incidents. In the early 2000s, Vicente Garcia ordered Shanna to shoot a suspected member of the rival Two-Six gang who had been seen in a bar frequented by Latin Kings. The order was carried out: Latin Kings shot the man in the chest about five times. Around the same time, King ordered Shanna (then an Inca) to have one of his soldiers shoot other Two-Six gang members; once again, the subordinates completed the mission.

The fall of 2007 was a particularly violent period. That September, the Latin Kings carried out retaliatory drive-by shootings against members of two rival gangs, the Two-Sixes and the Latin Disciples, after defendant Gutierrez was shot. Shanna testified that Guzman ordered the five sections nearest Gutierrez's to carry out the attacks. The jury heard a recording of Guzman discussing this "burn" with Shanna; Zambrano and Vicente Garcia were present when Guzman gave the order. In October 2007, soldiers under Ramirez's command shot and killed Oberia Pierce and wounded his companion Keith Morgan. The two victims apparently had come to Little Village to buy drugs. In a recorded conversation, Ramirez told Shanna that "some pimp" was "smoked" by his guys, and that Ramirez was hiding the shooter. Then, in November of the same year, unidentified Latin Kings shot at an SUV carrying members of a band who were trying to

park in the Kings' territory. In a recorded conversation, Inca Chavez explained that the Kings shot at the car because it was speeding in Little Village. Shanna testified at the trial that the gang had standing instructions to fire at traffic violators, as they were thought to indicate a threat to the gang.

The violence continued in 2008. In January, the Latin Kings retaliated viciously after Shanna was shot by a Two-Six gang member. The victim, Jaime Galvan, was shot multiple times, once "in the dome" as the local Inca later boasted in a recorded conversation. Two other Latin Kings proceeded to beat Galvan after he was shot; he survived and testified at the trial, even though the bullet remains lodged in his head.

*Drug Distribution*. One way the Latin Kings made money was by selling cocaine. Evidence at the trial illustrated several occasions in 2007 and 2008 when gang leaders distributed cocaine to Incas, who were expected to sell it on the street. Vicente Garcia organized weekly distributions of seven grams of cocaine to each of the 24 Incas in Little Village; they were all supposed to return $200 from the proceeds of these sales to the gang's treasury (known as The Box) within a few days. Guzman also met with each distributing Inca. Chavez was one of the Incas who took the cocaine and later returned the required cash. Similar transactions took place throughout early 2008.

*Extortion*. Another source of the gang's funds was extortion of a group known as the "Miqueros." The Miqueros were in the business of selling fraudulent identification documents at several locations in the Latin Kings' 26th Street Region. The Latin Kings required the Miqueros to pay a substantial "street tax" of about $2,000 to $2,500 every month for

"protection." In return for the tax, the Latin Kings agreed that they would not start their own phony-document business, a commitment codified in the Little Village Rules. The evidence showed that this practice had been going on since at least 1996.

Shanna testified that as long as the Miqueros paid the tax and complied with certain restrictions, the Latin Kings refrained from harassing or punishing them. The consequences for disobeying the Latin Kings, however, were severe. In January 1998, for example, after some Miqueros failed to comply with the Latin Kings' terms, Shanna and other Latin Kings were ordered to "beat the heck out of them." After the beating, it appears that the Miqueros never again dared defy the Latin Kings.

Shanna testified that the money was collected at the behest of Vicente Garcia and Zambrano. Other evidence indicated that Zamora also collected money from the Miqueros on King's orders. The money collected from the Miqueros went directly to the gang's coffers; it was devoted to expenses such as gang member funerals and gun purchases.

*Violations (Punishments).* The word "violation" was used by the Latin Kings to denote the prescribed punishment (usually brutal) for failure to abide by gang rules. A gang member who was "violated" was, euphemisms aside, beaten severely for a set number of minutes, normally under the supervision of the Regional Enforcer. For instance, when one person left the gang for a time, he was beaten from head to toe for three minutes; the punishment left him with a broken rib. Sometimes the "violation" administrators used only their legs and fists, but other times they used devices such as lead pipes, hammers, or crowbars. Gang members who

failed to carry out a violation with sufficient viciousness were themselves violated.

A variety of offenses could lead to a violation: leaving the gang; failing to repay a debt owed to a fellow gang member; failing to pay dues; refusing to participate in mandatory bust-outs (in other words, not helping the section maintain an armed street presence during specified hours); and refusing to carry out a retaliatory shooting. But the reason was not always so specific. On one occasion, Vicente Garcia ordered violations for people that he "deemed not worthy of being a Latin King anymore."

A vivid example comes from February 2006, when Vicente Garcia settled a fight between two sections in Little Village by ordering the violation of a man named Chongo and the murder of a member of the rival Latin Counts gang. Testimony at trial indicated that Chongo failed to carry out a retaliatory shooting. This led to the violation of Nedal Issa, the Inca of Chongo's section, whose leadership position made him responsible for Chongo's insubordination. Issa suffered two black eyes, fractured ribs, and bruises all over his body. Chongo was also violated; his ordeal was captured on a video that the jury viewed. Eventually, other Latin Kings from Issa's section carried out the retaliatory murder of the rival gang member.

In April 2008, Zambrano ordered gang members to break the hands of Latin Kings Rodolfo Salazar and Enrique Enriquez. Salazar had been dealing cocaine with a woman named Maria, who was Zambrano's girlfriend at the time. Salazar had the bad judgment to try to steal drugs and money from Maria. Zambrano passed the word along to Salazar that he had two choices: leave Maria alone or Zambrano

would "have somebody bring him and whoop his ass." After Salazar and Enriquez were caught stealing from Maria, Salazar chose option two, but it was their hands rather than their backsides that suffered. On Zambrano's orders, gang member Caquias used a hammer and a landscaping brick to smash Salazar's and Enriquez's hands as a violation. After hearing that the hand-smashings had been carried out, Zambrano mused that Salazar "did that to himself." Shanna later explained that Salazar "was warned, and he still messed up, and he suffered the consequences."

The record contains many additional examples of violations, but this is enough to give a flavor of what they were and how they were used to enforce strict discipline within the gang. The Latin Kings also had a well-elaborated governance structure, reflected in the gang's manifesto, its constitution, and rules specific to the Little Village region. The manifesto set forth the Kings' national emblem, colors, flag, prayer, and salute. It included a code that governed every member. The constitution provided details about positions, ranks, leadership hierarchy, voting procedures, the adoption of new laws, and certain trial procedures. At the regional level, Little Village had a set of 25 rules, all of which had been approved by Zambrano. A couple of rules highlighted the proper use of guns; another described the mandatory bust-outs; and some rules underscored the life-and-death character of gang membership. All gang members were required to be familiar with the gang's literature.

## II

A brief overview of the charges provides helpful context as we turn to the individual appeals. In an 80-count superseding indictment returned on September 30, 2009, all nine

appellants—as well as several others not involved in this appeal—were charged with participating in a RICO conspiracy in violation of 18 U.S.C. § 1962(d). Zambrano, Vicente Garcia, King, Gutierrez, and Zamora were also charged with conspiring to commit extortion in violation of 18 U.S.C. § 1951, and Zambrano, Vicente Garcia, and Guzman with committing assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3). Vicente Garcia and Guzman were charged with using and carrying a firearm during an assault in violation of 18 U.S.C. § 924(c). Finally, the indictment charged Vicente Garcia, Guzman, Luis Garcia, Gutierrez, Ramirez, and Chavez with conspiring to distribute cocaine in violation of 21 U.S.C. § 846, and it accused Vicente Garcia, Chavez, Gutierrez, Ramirez, and Luis Garcia of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).

A jury found Zambrano, Vicente Garcia, Guzman, and Chavez guilty on all counts. The other five defendants pleaded guilty. The district court sentenced all nine to substantial terms in prison. Although some of the points on appeal are common to more than one appellant, for ease of exposition we address each person's arguments individually.

## III

### A.  Augustin Zambrano

Four of Zambrano's arguments on appeal pertain to his conviction, and five attack his sentence. In addition, he raises several points that we can treat more summarily. With respect to his conviction, Zambrano maintains that the evidence was insufficient on the charge of conspiracy to commit extortion; that the admission of another defendant's post-

arrest statement violated Zambrano's Sixth Amendment rights; that the evidence was insufficient to support the conviction for assault in aid of racketeering; and that the jury instructions on assault improperly had the effect of constructively amending the indictment. With respect to the sentence, Zambrano argues that the court exceeded the statutory maximum for each offense; that his convictions and sentences for both RICO and extortion conspiracies violated the Double Jeopardy Clause; that the sentence was based on facts not found by the jury; that the district court applied the wrong standard of proof at sentencing; and that the district court improperly applied the sentencing guidelines. Zambrano also complains (referring to *Pinkerton v. United States*, 328 U.S. 640 (1946)) that what he calls the judge's half-*Pinkerton* instruction violated his rights; that there is an unwarranted disparity between his sentence and those of his co-defendants; and that cumulative errors deprived him of a fair trial. We address these points in turn.

*Sufficiency of the Evidence on Extortion and Constructive Amendment of Extortion Charge*. Count Ten of the indictment charged that Zambrano participated in the conspiracy "[f]rom sometime in at least 2000 and continuing until at least September 2008." This charge referred to the Latin Kings' regular shake-downs of the Miqueros. Zambrano seizes on the fact that the direct evidence of force or threatened force comes only from before 2000, the start of the conspiracy alleged in the indictment. (He also hints at arguments based on a variance in the indictment and some kind of Fifth Amendment violation, but in substance he is really attacking the sufficiency of the evidence, an argument he preserved through a motion under Federal Rule of Criminal Procedure 29.) Former Latin King and cooperating witness

Shanna testified that in 1998 or thereabouts he was twice sent to beat up some Miqueros who were not complying with their arrangement with the Latin Kings. Although Zambrano does not dispute the fact that the Miqueros made monthly payments to the Latin Kings beginning in 1997 and continuing throughout the period covered by the indictment, he insists that there is no evidence that these payments were the result of "wrongful use of actual or threatened force, violence, or fear." See 18 U.S.C. § 1951(b)(2).

The standard of review for such a challenge is highly deferential to the jury's verdict. We assess a challenge to the sufficiency of the evidence in the light most favorable to the government and will reverse a conviction "only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 132 S. Ct. 2, 3–4 (2011) (per curiam) (citing *Jackson v. Virginia,* 443 U.S. 307 (1979)). Zambrano has not cleared that high bar, because some evidence supports the finding that it was the use of actual or threatened force that inspired the Miqueros to pay the Latin Kings, not some other motivation. The evidence is circumstantial, but there is nothing wrong with circumstantial evidence. The government's evidence showed that the Miqueros made monthly payments of $2,000 to $2,500 in exchange for protection and that Latin Kings beat up non-compliant Miqueros twice in 1998. In light of the earlier beatings, the jury was entitled to conclude that the group from whom the Miqueros needed protection was the Latin Kings themselves. Zambrano suggests that the payments ensured protection from renegade Latin Kings members, but the jury could have credited the evidence showing that the gang strictly disciplined its own members (recall Salazar's and Enriquez's smashed hands). Renegade

behavior, the jury might have thought, would not last long, certainly not for the full period between 2000 and 2008.

It is of no moment that one of the cases on which the government relies, *United States v. Sturman*, 49 F.3d 1275 (7th Cir. 1995), involved express threats while here we have only implied threats. An implied threat can be the basis for an extortion conviction. See, *e.g.*, *United States v. Kuta*, 518 F.2d 947, 951 (7th Cir. 1975); *United States v. Crowley*, 504 F.2d 992, 998 (7th Cir. 1974); *United States v. DeMet*, 486 F.2d 816, 820 (7th Cir. 1973). The jury heard ample evidence from which it could conclude that the Miqueros paid the Latin Kings under an implied threat of violence for the period alleged in the indictment. After seeing the consequences of noncompliance, the Miqueros made sizable monthly payments for a decade without interruption. That is enough to support the jury's verdict under the generous standard for evaluating the sufficiency of the evidence.

It is also enough to reject Zambrano's claim that the government constructively broadened the indictment by expanding the time it covered. He asserts that the jury convicted him for conduct undertaken in 1997, three years before the alleged conspiracy began. But that is the wrong way to look at it. Whatever the government may have shown about 1997, standing alone, does not matter. What does matter is that it presented evidence of a standing threat, and that evidence permitted a rational jury to conclude that the charged conspiracy to commit extortion existed, and that it lasted from 2000 to 2008.

*Confrontation Clause*. At trial, FBI Special Agent Christopher Weismantel testified about certain statements that Zambrano's co-defendant Guzman made after he was arrest-

ed. Guzman admitted his role in the Latin Kings and de-
scribed his participation in several criminal acts ordered by
the gang's leadership. The district court allowed the testimo-
ny, but it required redactions of Guzman's statement to pro-
tect the rights of the other defendants in accordance with
*Bruton v. United States*, 391 U.S. 123 (1968). Later, the court
told the jury that it could "not consider [Guzman's] state-
ment as evidence against any defendant other than defend-
ant Jose Guzman." Elsewhere in the charge, however, the
court instructed the jury that all conspirators were criminally
liable for the acts of co-conspirators under the *Pinkerton* doc-
trine.

Zambrano argues that these two instructions, taken to-
gether, probably confused the jury in a way that violated his
rights under the Confrontation Clause of the Sixth Amend-
ment. Applying the *Pinkerton* doctrine, which as a substan-
tive matter makes each co-conspirator responsible for the
reasonably foreseeable acts of others who have joined the
conspiracy, he argues that the jury might indirectly have
based his conviction on Guzman's statement. (Presumably
Zambrano is saying that the court's instruction permitted the
jury to base Guzman's own conviction on his statement and
then, once Guzman had been properly linked to the conspir-
acy, Guzman's actions became Zambrano's.)

Before addressing this, we must say a word about the
standard of review. Typically, we review *de novo* a complaint
that the admission of a co-conspirator's statement violated
the defendant's constitutional rights under the Confrontation
Clause. *United States v. Green*, 648 F.3d 569, 574 (7th Cir.
2011); *United States v. Burgos*, 539 F.3d 641, 643 (7th Cir. 2008).
(This is in contrast to the clear error standard of review that

applies to preliminary questions affecting admissibility, such as whether a conspiracy existed or if an act was within the scope of the conspiracy. See *United States v. Martinez de Ortiz,* 907 F.2d 629, 632 (7th Cir. 1990) (en banc).) In this case, however, the government contends that Zambrano waived or forfeited his argument because he did not object to the redacted version of Guzman's statement that was used at trial. The failure to object normally results only in forfeiture, not in waiver, and we think that forfeiture is the better way to characterize what happened here. Forfeited issues are reviewed for plain error. *Puckett v. United States,* 556 U.S. 129, 135 (2009); *United States v. Olano,* 507 U.S. 725, 732 (1993).

If Guzman's statement were the only evidence—or even particularly compelling evidence—offered to show the necessary overt act for Zambrano's RICO charge, we would have a closer case. But it is neither. A RICO conspiracy charge requires proof of two predicate acts, or an agreement to commit those acts, in furtherance of the conspiracy. See *United States v. Tello,* 687 F.3d 785, 792–93 (7th Cir. 2012). Even without anything Guzman said, the record contains overwhelming evidence that Zambrano agreed to the commission of far more than two such acts. He was involved with cocaine distribution; he issued standing orders for retaliatory shootings; and he supervised some violations for member misconduct. Those facts were well supported by testimony from five former gang members, audio recordings of conversations discussing retaliatory shootings, video evidence of violations, and documentary evidence of the gang's rules. The two central predicate acts alleged against Zambrano—the extortion of the Miqueros and the hand-smashing—are not even mentioned in Guzman's statement. If there was error at all in the admission of the statement or

the instructions that addressed it, any such error was harmless.

*Sufficiency of the Evidence for Assault in Aid of Racketeering.* This part of Zambrano's appeal relates to the charge of assault with a dangerous weapon "for the purpose of maintaining and increasing [his] position in the Latin Kings," in violation of 18 U.S.C. § 1959(a)(3). The assault at issue was the smashing of Salazar's and Enriquez's hands we described earlier. Shanna and Caquias testified that Zambrano instructed Shanna to threaten Salazar, and that even though Zambrano was not present while the violations were administered, he approved them after the fact. Zambrano contends that the evidence did not show that he ordered the assaults and that even if he did, his motivation was not gang discipline—it was love and revenge.

It is hard to take the latter argument seriously. We are confident that a rational jury could find that the assaults were committed at Zambrano's command, that they were not for love or personal revenge, and that he was enforcing gang rules. Shanna and Caquias said exactly this in their testimony, which the jury was entitled to credit. The fact that the recorded conversations captured Zambrano ordering Shanna to "'whoop' [Salazar's] ass" rather than break his hands does nothing to undermine the jury's finding. At best, the recording would impeach one of the details of Shanna's testimony. The key point is that the evidence shows that Zambrano ordered an assault of the sort described by § 1959, which a person violates if he "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual" for the purpose of

"maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a)(3); see also *United States v. DeSilva,* 505 F.3d 711, 715 (7th Cir. 2007); *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir. 1992). This is not a case like *United States v. Thai,* 29 F.3d 785 (2d Cir. 1994), in which there was "no evidence from which the jury could conclude that [defendant's] motive … was other than purely mercenary," *id.* at 818. Zambrano's order went through the Latin Kings' chain of command; it was implemented by subordinates; the victims were Latin Kings members who had defied express orders and broken gang rules; and the assaults followed the ritualistic pattern used for "violations." Tellingly, the victims acquiesced in their own brutal punishment. This was more than sufficient to support the jury's verdict.

*Constructive Amendment of Indictment: Assault Charge.* At trial, Zambrano objected to proposed jury instruction 54, which stated that the government did not have to prove that the defendant's only motive for the crime of violence was to maintain or increase his position in the enterprise. "It is sufficient," the instruction went on, "if the defendant committed the crime of violence because he knew it was expected of him by reasons of his membership in the enterprise, or because he committed it in furtherance of that membership." Zambrano complains that the quoted language permitted the jury to convict him without finding that his motive was to maintain or improve his stature in the gang.

This argument, like Zambrano's other constructive amendment assertion, is really nothing more than a complaint about the jury instruction. Zambrano has not identified anything wrong with this count of the indictment. Nor,

for that matter, has he pointed to anything wrong with the jury instruction. It correctly states that the jury did not need to find that Zambrano's sole or principal motive was to maintain his position in the gang. See *DeSilva*, 505 F.3d at 715–16; *Concepcion*, 983 F.2d at 381; *United States v. Carson*, 455 F.3d 336, 371 (D.C. Cir. 2006); *United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998). *DeSilva* recognized that "[t]he motive requirement of the offense … is met if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." 505 F.3d at 715 (internal quotation marks omitted).

Zambrano next complains that the district court failed to instruct the jury on the appropriate standard of proof. He did not raise this point at trial, but even if he had, we would reject it. The jury was instructed several times that it needed to find all facts beyond a reasonable doubt. The court reminded the jury of this duty immediately before instructing it on the § 1959 count. Short of repeating this admonition in every paragraph of the instructions, we do not see what more the court could have done.

*Sentence in Excess of Statutory Maximum*. Zambrano was convicted of three offenses (RICO conspiracy, assault, and extortion), each of which carries a statutory maximum sentence of 20 years. In computing his recommended sentence under the guidelines, the district court used "the offense level applicable to the underlying racketeering activity," as sentencing guideline § 2E1.1(a)(2) directs. That took the court to the guideline for first-degree murder, § 2A1.1, which calls for a base offense level of 43. After appropriate adjustments,

that was Zambrano's final offense level. It calls for life imprisonment, but that sentence would have exceeded the statutory maxima for Zambrano's crimes of conviction. Applying the guidelines for sentencing on multiple counts of conviction under § 5G1.2, the court decided to impose three consecutive 20-year sentences in order to achieve the maximum possible punishment of 60 years' imprisonment. See 18 U.S.C. § 3584(a).

The court was well within its authority to do so. The imposition of consecutive sentences on separate counts of conviction does not have the effect of pushing a sentence on any one count above the statutory maximum for a single count of conviction. See *United States v. Thompson*, 523 F.3d 806, 814 (7th Cir. 2008); *United States v. Veysey*, 334 F.3d 600, 602 (7th Cir. 2003). The court was entitled to find the facts by a preponderance of the evidence, so long as those facts did not affect either the statutory maximum, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), or the statutory minimum, *Alleyne v. United States*, 133 S.Ct. 2151, 2155 (2013). The district court's finding that Zambrano should be held accountable for the murders and attempted murders attributable to the Latin Kings did nothing more than inform its decision on the advisory guideline range and its ultimate choice of a reasonable sentence in light of the factors identified in 18 U.S.C. § 3553(a).

Finally, the fact that a man of Zambrano's age is likely to perish in prison before the 60-year term expires does not automatically convert his overall sentence, as a matter of law, into an unreasonable one. See *United States v. Johnson*, 685 F.3d 660, 663 (7th Cir. 2012) (collecting cases) (defendant's likelihood of living out sentence is just one consideration for

the district court to weigh). We have said that "death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court." *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006). We have also been wary of a *de facto* life sentence when it was imposed without any explanation despite the district court's rejection of an actual life sentence. *United States v. Patrick*, 707 F.3d 815, 820 (7th Cir. 2013) (vacating and remanding sentence for further explanation). Zambrano's life sentence, however, was neither inconsistent with the district court's sentencing determinations nor imposed lightly. After hearing Zambrano's argument, the district court recounted his lengthy criminal history and recidivism, as well as the instrumental role he played in the gang as its highest-ranking member and the importance of imposing a sentence that deters future criminals. The court gave serious consideration to, and sufficient explanation for, its sentence, and that sentence was reasonable.

*Double Jeopardy*. Next, Zambrano argues that his dual convictions for RICO conspiracy and the predicate act of conspiracy to commit extortion exposed him to double jeopardy in violation of the Fifth Amendment. He did not raise this issue before the district court, and so our review is for plain error.

The type of double-jeopardy argument Zambrano is making deals with cumulative punishment, not with successive prosecutions. The Supreme Court has held that "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter,* 459 U.S. 359, 365

(1983); see also *Grady v. Corbin*, 495 U.S. 508, 516–17 (1990), *overruled on other grounds by United States v. Dixon*, 509 U.S. 688 (1993). The only question before us is thus "whether Congress, in making the predicate RICO acts relevant to sentence determination via the Sentencing Guidelines, intended to allow defendants to receive consecutive sentences for both the predicate acts and the RICO offense." *United States v. Morgano*, 39 F.3d 1358, 1366 (7th Cir. 1994). We held in *Morgano* that Congress intended exactly this, and every other circuit to consider the question has agreed with this view. See *id.* at 1367–68 (collecting cases). Zambrano offers no reason for us to change course. We thus conclude that this argument has no merit, no matter what the standard of review.

*Other Arguments.* Lastly, Zambrano raises a number of points that we will discuss in greater detail in connection with his co-defendants' appeals. He argues, for instance, that the district court should not have used the preponderance of the evidence standard of proof at the sentencing phase; that sentencing for conspiracies under § 1B1.2(d) must use the reasonable-doubt standard; that there is an unwarranted disparity between his sentence and those of his co-defendants; and that his trial was so riddled with errors cumulatively that his due-process rights were violated. We find no merit in any of these points. We therefore affirm the judgment in Zambrano's case in its entirety.

## B. Vicente Garcia

In April 2008, Vicente Garcia (whom we will call Vicente to differentiate him from co-defendant Luis Garcia) became the Supreme Regional Inca, the gang's second-highest-ranking member. The jury convicted him on all counts. He was sentenced to 360 months' imprisonment for possession

with intent to distribute a controlled substance; 240 months each for count 1 (RICO conspiracy), counts 2 and 9 (commission of violent crime in aid of racketeering), count 10 (extortion), and count 14 (possession with intent to distribute a controlled substance); and 60 months each for counts 11 and 13 (possession with intent to distribute). The court ordered these sentences to run concurrently. In addition, it imposed a consecutive sentence of 120 months on count 3 (use of a firearm in relation to a crime of violence). All told, Vicente received a total sentence of 480 months in prison.

Vicente raises eight arguments in his brief: (1) the "half-*Pinkerton*" instruction violated his rights; (2) his convictions for violent crimes in aid of racketeering violated his Double Jeopardy rights; (3) his mandatory minimum sentence for use of a firearm violated the Supreme Court's rule in *Alleyne*; (4) his conviction on count 9 for a violent crime in aid of racketeering should be set aside for insufficient evidence; (5) the evidence on his extortion conviction was insufficient; (6) the court erred by refusing to grant a mistrial after the jury saw some of the defendants being escorted by U.S. marshals; (7) the court applied the wrong standard of proof at sentencing; and (8) the court improperly applied the sentencing guidelines.

Our discussion of arguments 7 (standard of proof at sentencing) and 8 (application of the guidelines) in Zambrano's appeal suffices to show why we reject them here as well. The complaint about the "half-*Pinkerton*" instruction also has no merit. Like Zambrano's, Vicente's conviction did not depend on *Pinkerton* liability. Instead, the jury found beyond a reasonable doubt that Vicente was directly responsible for several predicate acts. Even if the *Pinkerton* instruction was er-

roneous (for the sake of argument only), any such error was harmless.

We can also reject argument 2 (Double Jeopardy) for similar reasons to those we gave in our discussion of Zambrano's appeal, although Vicente's point is slightly different. Whereas Zambrano argued that he could not be convicted for both a RICO conspiracy and the underlying predicate acts, Vicente asserts that it was unconstitutional to convict him of assault with a dangerous weapon in furtherance of a racketeering enterprise (in violation of 18 U.S.C. § 1959(a)(3)) and use of a firearm in relation to a crime of violence (in violation of 18 U.S.C. § 924(c)), when the crime of violence is the same assault with a dangerous weapon. As we noted before, however, Congress may provide for multiple punishments for the same act without violating the Double Jeopardy clause if the statute demonstrates the clear intent to do so, and we have held that Congress intended to impose such "stacked" punishments when it passed § 924(c). See *United States v. Seawood*, 172 F.3d 986, 989 (7th Cir. 1999). Indeed, § 924(c)(1) explicitly prescribes that a sentence under that statute must be imposed "in addition to" the punishment for the underlying crime of violence. Assault in furtherance of racketeering enterprise is just the sort of "crime of violence" that Congress wanted to include within § 924(c)'s ambit, and so Vicente's argument fails.

*Mandatory Minimum and* Alleyne. Vicente received a 10-year sentence for carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). That statute prescribes that a defendant who has discharged the firearm must be given a prison term of not less than ten years. See *id*. § 924(c)(1)(A)(iii). Vicente argues that the district court erred

insofar as it believed that the 10-year mandatory minimum applied, because he believes that *Alleyne* requires a jury finding beyond a reasonable doubt that he discharged the firearm, and that there was no such finding.

That might be a good argument if the record supported it, but it does not. The same underlying conduct gave rise to counts 2 and 3 in the indictment. For count 2, the court instructed the jury as follows:

> For the purposes of Count 2, the indictment charges that defendant Vicente Garcia knowingly and intentionally committed an assault with a dangerous weapon upon Victim A in violation of the laws of the State of Illinois. … Under Illinois law a person commits the offense … when he … by means of discharging a firearm, knowingly and intentionally causes injury to another person.

Because the jury convicted Vicente on count 2, it necessarily found beyond a reasonable doubt that he "discharged" a firearm. The district court therefore did not run afoul of the *Alleyne* rule when it applied the mandatory minimum sentence of 10 years to him.

*Sufficiency of Evidence: Assault in Aid of Racketeering.* Vicente has little to add to Zambrano's arguments on this point. He asserts that personal animus, not a desire to maintain or improve status in the gang, lay behind the hand-smashings of Salazar and Enriquez. That argument is no better than the one that Zambrano advanced. Vicente also disputes Zambrano's contention that he (Vicente) was the one who ordered the smashings; the responsible person, he says,

was Zambrano. Perhaps a jury could have assigned all the blame to Zambrano, but this jury did not, and we have no reason to second-guess its determination.

*Other Arguments*. Each of Vicente's other arguments tracks points made by various co-defendants. (The court is grateful for counsel's efforts to coordinate in this way.) He contends that the evidence of extortion was insufficient, but we explained in the section on Zambrano why there was enough in the record to support the jury's finding in this respect. We discuss the incident in which some jurors allegedly saw several of the defendants (perhaps including Vicente) being escorted by the U.S. marshals from the holding cell into the courtroom when we turn to Guzman's appeal. In brief, we find no reversible error in the court's decision not to order a mistrial on this basis.

## C. Jose Guzman

Next we address the appeal of Regional Enforcer Jose Guzman. Evidence at the trial showed that Guzman extracted fines from gang members and oversaw at least one violation. FBI Agent Weismantel, who arrested Guzman, identified the latter's tattoos as being associated with the Latin Kings. Shanna testified that Guzman worked as a first-level distributor of cocaine for the Latin Kings' drug operations. Guzman was convicted after a jury trial and sentenced to 240 months on the RICO count and 180 months on the drug conspiracy count, to run consecutively (thus 420 months in all). He too raises quite a few issues on appeal, but we focus here on three of them: his challenge to the sufficiency of the evidence linking him to the RICO enterprise; his motion for a mistrial based on the jury's alleged view of him and several co-defendants being moved from the holding cell to the

courtroom; and his contention that the jury instructions on the RICO predicate acts were faulty.

*Rule 29 Motion: RICO count.* At trial, Guzman moved for a judgment of acquittal on the RICO conspiracy count under Federal Rule of Criminal Procedure 29. We review the denial of a Rule 29 motion *de novo;* when the motion is based on insufficiency of the evidence, the only question before us is whether the district court erred in its determination that there was enough evidence to reach the jury. See *United States v. Johns,* 686 F.3d 438, 446 (7th Cir. 2012). That determination, as we noted in connection with Zambrano's appeal, is governed by the rigorous *Jackson v. Virginia* standard.

There are several ways in which the government may prove participation in a RICO conspiracy, but the one pertinent to Guzman comes from 18 U.S.C. § 1962(c). That part of the statute forbids a person to "conduct or participate, directly or indirectly," in the enterprise's pattern of racketeering activities. The government thus had to prove that Guzman conspired to participate (in the way defined by § 1962(c)) in the Latin Kings' racketeering operations.

Guzman's first argument—that the government failed to introduce sufficient evidence that he was personally involved in two predicate acts—requires little comment. This was a conspiracy charge, not a substantive § 1962(c) charge. All the government had to show was that another member of the enterprise committed the two predicate acts and that Guzman "knew about and agreed to facilitate the scheme." *Salinas v. United States,* 522 U.S. 52, 66 (1997). Guzman can prevail only if no rational juror could have found that he was part of, or agreed to facilitate, the activities of the Latin Kings. But the record contains ample evidence supporting

the jury's verdict. Shanna, for instance, testified that Guzman was a Regional Enforcer for the Latin Kings in December 2007 and that he oversaw violations in that capacity. The jury also heard testimony that Guzman distributed drugs for the gang. And these are just two examples of many we could cite. The district court properly denied Guzman's Rule 29 motion.

*Mistrial.* We alluded to this argument in our discussion of Vicente Garcia's appeal, but we now discuss more fully the incident that prompted motions for a mistrial from several defendants. Guzman's counsel moved for a mistrial after he learned that the jurors allegedly saw Guzman and his co-defendants being escorted from the holding cell to their seats in the courtroom. Relying on *Estelle v. Williams*, 425 U.S. 501 (1976), Guzman contends that the presumption of innocence to which he was entitled was undermined when the jurors spotted him, as he put it, being "paraded into the courtroom with U.S. marshals as guards."

In *Williams*, the Supreme Court held that it violates the Fourteenth Amendment to force a defendant to wear prison garb during his jury trial. *Id.* at 504–05. We have held that *Williams* extends to the right not to appear before the jury in shackles, unless they are necessary to control contumacious conduct. *Harrell v. Israel*, 672 F.2d 632, 635 (7th Cir. 1982) (citing *Illinois v. Allen*, 397 U.S. 337, 344 (1970)). But *Williams* and *Harrell* deal with a continuing, outward sign to the jury that might undermine the presumption of innocence. The Court did not hold that everything that might remind the jury of the accusation is impermissible; indeed, that would be impossible, since the jury is obviously aware of who the defendants are and the nature of the charges.

Here we have only an isolated glimpse, assuming for the sake of argument that the jurors actually saw what happened. (That is unclear, but we do not need to resolve the question.) The district court decided that any prejudice was *de minimis*, maybe nonexistent, because the jurors could not have known that the defendants were coming from the "tank" and they might not have seen anything at all. We share the district judge's impression that this alleged incident was too minor to have made any difference, and we would not be inclined in any event to second-guess the trial judge's assessment of the situation.

*Jury Instructions: Predicate Acts.* Guzman argues that the court erred by refusing to instruct the jury that it had to agree on which predicate acts the government proved beyond a reasonable doubt before it could convict on the RICO count. In our view, he forfeited this objection at the trial. Guzman did object to Instruction 27, which said, "An offense may be committed by more than one person. A defendant's guilt may be established without proof that the defendant personally performed every act constituting the crime charged." Guzman's counsel had this to say about the instruction:

> I don't specifically object to the instruction being given, but I'd ask that the language be put in there of some sort that says that guilt still has to be proven beyond a reasonable doubt. …

> [W]hat this says, Judge, is the defense may be submitted [*sic*] by more than one person. The defendant's guilt may be established without proof that the defendant personally per-

> formed every act. And in the elements instruc-
> tion now they are saying someone else may
> have performed the acts and still be found
> guilty.

Nothing in that objection alerted the district court to the fact that the defendant believed that there must be an instruction telling the jury that it had to agree unanimously on the predicate acts supporting the RICO conspiracy.

Proceeding under plain error review, we see no reversible error. Both sides refer us to *United States v. Campione*, 942 F.2d 429 (7th Cir. 1991), which held that even if defendants agree to different predicate acts, it is enough if each defendant agrees to two predicate acts in furtherance of the conspiracy. *Id.* at 436. In other words, the government need not prove which two predicate acts occurred; it must show only that each defendant agreed to two predicate acts (not necessarily the same) in furtherance of the conspiracy. *Campione*, however, does not answer the question whether a jury needs to agree unanimously on which two predicate acts a *single* defendant committed in furtherance of the RICO conspiracy. *Cf. Richardson v. United States*, 526 U.S. 813, 816 (1999) (jury in a continuing criminal enterprise case, 21 U.S.C. § 848, must agree unanimously on the specific violations that make up that continuing series).

Had Guzman properly raised the point, we would explore it further. But he did not. The instruction to which he objected did not invite the jurors to find Guzman guilty without a unanimous finding on the particular predicate acts he committed; it said nothing about that point. Particularly in light of the remainder of the jury's verdict (under which Guzman was found guilty of conspiring to distribute co-

caine) and the evidence showing his deep involvement with the Latin Kings, this is not a situation in which we are prepared to find plain error.

*Other Arguments.* Guzman raises a mélange of additional arguments, but we find no reversible error on any of these grounds:

- Lack of a buyer-seller instruction on the drug distribution count (see Chavez's appeal, *infra* at 32).

- Use of the preponderance-of-the-evidence standard for facts found at the sentencing phase (see King's appeal, *infra* at 36).

- Use of the preponderance standard for setting the baseline offense level for the RICO conspiracy (see King's appeal, *infra* at 37).

- Insufficient evidence to prove conspiracy to commit murder (see Chavez's appeal, *infra* at 35).

- Violation of Double Jeopardy to count drug conspiracy separately from RICO conspiracy (see Zambrano's appeal, *supra* at 20).

- Sentence for the drug conspiracy violates the Eighth Amendment because it is disproportionately long. See generally *Harmelin v. Michigan*, 501 U.S. 957 (1991) (upholding sentence of life without parole for drug-distribution offense).

In summary, we find no grounds for reversing either Guzman's conviction or his sentence.

### D.  Alfonso Chavez

Chavez, Inca of the 31st and Drake chapter of the Latin Kings' Little Village region, is the last of the appellants convicted following the joint trial. The indictment charged him with the RICO conspiracy, the drug-trafficking conspiracy, and possession of cocaine with intent to distribute. After the jury convicted him on all three counts, the court sentenced him to the maximum allowable sentence of 240 months on the RICO count and 360 months on each of the drug counts, all to run concurrently. We address here his arguments about the sufficiency of the evidence on his two drug counts, the lack of a buyer-seller instruction, the "half-*Pinkerton*" instruction, and his link (for sentencing purposes) to the gang's murders and attempted murders. As before, we summarize additional arguments that do not require extended discussion.

*Sufficiency of the Evidence: Drug Counts*. Chavez challenges the evidence supporting his convictions for conspiring to distribute drugs and for possession with intent to distribute cocaine. Like his co-appellants, he can succeed only if no rational jury could have found that the government met its burden to prove guilt beyond a reasonable doubt.

Unfortunately for Chavez, juries are entitled to decide whom to believe and whose testimony to reject. This jury credited Shanna's testimony and several audio recordings that Shanna secretly taped. This evidence showed that Shanna passed along to Chavez about seven grams of cocaine on three occasions within a three-week period. Each time, Chavez promised to pay Shanna $200 within the next week. On the first occasion, Chavez informed Shanna that he (Chavez) was the new Inca on Drake. Shanna told Chavez that he was using the "process that we take with all the In-

cas." Another Latin King told Chavez that he had "like about a week … to get rid of it [the cocaine] … [and] give us back two bills [$200]." Shanna also noted that "the collections are gonna be on … Mondays and Fridays." Chavez returned, as ordered, with the money a week later. On a later occasion, after commenting that he had "24 people doing this," Shanna asked Chavez whether "you guys alright with this?" Chavez replied, "I mean, bro, we're all for uh, well, um, I'm up for helping yous out."

Chavez has little with which to defuse this evidence. He argues that he was purchasing the cocaine for his own use, not for distribution or as part of a distribution conspiracy. In support of that position, he notes the relatively small quantities involved in each transaction, Shanna's admission that Chavez might have been taking the cocaine for personal use, Shanna's observation that as long as Chavez paid the $200 no one cared what he did with the drugs, and Chavez's question to Shanna about how long the sales were likely to go on. But there is nothing that compelled the jury to see the evidence in that light, even if Chavez's interpretation is possible. Viewed from the proper perspective, the evidence on both of Chavez's drug charges was sufficient to support the verdict.

*Buyer-Seller.* As we recognized in *United States v. Brown,* 726 F.3d 993 (7th Cir. 2013), the question whether a buyer-seller instruction should be given to a jury that is considering conspiracy charges is a difficult one. Our cases distinguish between buyer-seller relationships (which obviously involve a simple agreement) and conspiracies, which are also based on agreement. *Id.* at 997. We have held that the substantive crime of drug distribution—that is, the sale itself—

cannot also count as the agreement needed to find conspiracy. *United States v. Lechuga,* 994 F.2d 346, 349 (7th Cir. 1993) (en banc) (lead opinion of Posner, J.). Instead, a majority of the court agreed that "[w]hat is necessary and sufficient [to prove a conspiracy] is proof of an agreement to commit a crime other than the crime that consists of the sale itself." *Id.* at 347. In *Brown,* we confirmed this rule when we held that "conspiracy to traffic drugs requires an agreement to advance *further* distribution." 726 F.3d at 998.

Chavez's effort to show that the district court erred when it decided not to give a buyer-seller instruction runs into a number of obstacles. First, he failed to raise this argument in the district court, and so our review is only for plain error. See *Puckett* and *Olano, supra.* Had that not been the case, we would have considered this a closer question. Chavez's short tenure with the Latin Kings might have persuaded a jury that he was just a buyer. When the evidence of conspiracy is weak, we have urged courts to give a buyer-seller instruction on their own initiative. See *United States v. Gee,* 226 F.3d 885, 895 (7th Cir. 2000). But the evidence of conspiracy in the present case was strong; indeed, Chavez admitted that a drug conspiracy existed. The only remaining question was whether he was party to that conspiracy.

The evidence showing that Chavez bought seven grams of cocaine (about a quarter ounce, or two "eight balls") might have supported a finding by the jury that this was a personal-use transaction. But there was a great deal of evidence that pointed in the conspiracy direction. Apart from the admitted agreement, Chavez's role in the Latin Kings was undisputed, and the audio recordings and Shanna's testimony were damning. Even if the district court erred by fail-

ing to give the buyer-seller instruction (and it seems to us that the more prudent course would have been to do so), the mistake was harmless on this record.

*Half-*Pinkerton. Chavez argues that the district court erred by giving only what he calls a half-*Pinkerton* instruction—one that failed to remind the jurors that they had to find beyond a reasonable doubt that at the time the co-conspirator's acts were undertaken, the defendant was (1) a member of the conspiracy and (2) the act was in furtherance of the conspiracy. See *United States v. Elizondo,* 920 F.2d 1308, 1317 (7th Cir. 1990); *United States v. Manzella,* 791 F.2d 1263, 1268 (7th Cir. 1986). In particular, the instruction here did not remind the jury that the government had to prove all elements of the *Pinkerton* doctrine beyond a reasonable doubt.

Once again, because Chavez and the others did not raise this argument before the district court, we review only for plain error. Failure to include the second half of the *Pinkerton* instruction may have been erroneous. No reason appears in the record for the district court's decision to omit the relevant passages from the Seventh Circuit's pattern jury instructions, which it had been following. See 7TH CIR. PATTERN INSTRUCTION 5.09. Even if the omission was wrong, however, the question remains whether this error affected Chavez's substantial rights and whether it brings disrepute on the legal system. See *Olano*, 507 U.S. at 736–37.

In *Neder v. United States,* the Supreme Court held that only a small set of errors "defy analysis by harmless error standards." 527 U.S. 1, 7 (1999) (quotation marks omitted). The Court's list includes the complete denial of counsel, a biased trial judge, racial discrimination in the selection of the grand jury, denial of self-representation at trial, denial of a

public trial, and a defective reasonable-doubt instruction. *Id.* at 8. The last of those might seem useful to Chavez, but a closer look persuades us that it is not. Chavez is not complaining about a defective reasonable-doubt instruction. He points to the district court's failure to remind the jury about the reasonable-doubt standard within the *Pinkerton* instruction. The court had, elsewhere in the instructions, told the jury that the government had to prove its case beyond a reasonable doubt.

We conclude that the harmless-error principle applies here, and that any error that resulted from the incomplete instruction did not affect Chavez's substantial rights. The district court read the correct reasonable doubt standard to the jury several times during the jury instructions, and there was no indication that the *Pinkerton* issue was to be governed by a different standard. Moreover, the government's case did not rely solely on the *Pinkerton* doctrine of vicarious liability among co-conspirators. The jury's other findings of guilt established the predicate acts necessary to convict all of the appellants who went to trial, except Chavez, without resort to *Pinkerton*. It convicted each one on multiple substantive counts, and those counts could have formed the basis for the RICO conspiracy convictions. The jury also found beyond a reasonable doubt that Chavez agreed to join the conspiracy. There were no facts suggesting that Chavez or his co-defendants were acting as rogues or mercenaries when they carried out their substantive offenses. To the contrary, the evidence overwhelmingly showed that they were acting as gang members, for the gang.

*Murders and Attempted Murders*. The district court sentenced Chavez in part based on its conclusion that he was

responsible for at least some of the gang's murders and at-
tempted murders. Chavez contests this finding because, as
he understands Illinois law, the crime of conspiracy to com-
mit murder requires an agreement to kill a specific person;
his agreement cannot be assumed, he continues, just because
he was part of the Latin Kings gang. His argument, however,
does not fit the facts. The district court did not hold him re-
sponsible for murder of a non-specific person or because of
his gang membership. Audio recordings reveal Chavez
boasting to Shanna that "some dude went speeding down
the block, and well you know how that goes. Dude got it[.]"
He also remarked that "my guys were on their stuff, you
know? And they, boom, you know? Dude got it." These
comments related to the shooting of Jorge Camargo as he
drove through Chavez's turf. In other words, Chavez was
doing just what he was supposed to do as the Inca of his sec-
tion. The district court did not abuse its discretion when it
took Camargo's attempted murder into account when de-
termining Chavez's sentence.

*Other Arguments*. Chavez also argues that the district
court violated his Fifth and Sixth Amendment rights when it
found the facts at sentencing using the preponderance-of-
the-evidence standard. We have repeatedly rejected this ar-
gument, and we do so again here for the reasons provided in
King's appeal. Similarly, we reject the argument that sentenc-
ing guideline § 1B1.2(d) applies here, and that it requires the
government to prove predicate RICO acts beyond a reasona-
ble doubt. King makes the same argument, which we discuss
below.

### E.  Fernando King

King was for a time the Supreme Regional Inca, just one step below the Corona in the gang's chain of command. He entered a guilty plea to the charges of RICO conspiracy and the drug-distribution conspiracy, without any plea bargain. His arguments pertain only to his sentence.

We need say very little about these arguments, because we understand all of them to be raised in this court primarily for the purpose of preserving them for further review. King argues that the district court violated his rights under the Fifth and Sixth Amendments and sentencing guideline § 1B1.2(d) when it found facts using a preponderance standard, instead of the reasonable-doubt standard. We have rejected the argument that a heightened standard is required. *E.g. United States v. Johnson*, 342 F.3d 731, 735–36 (7th Cir. 2003); *cf. United States v. Heckel,* 570 F.3d 791, 797 & n.3 (7th Cir. 2009). More importantly, the Supreme Court thus far has adhered to the rule that "[s]entencing factors … can be proved to a judge at sentencing by a preponderance of the evidence." *United States v. O'Brien,* 560 U.S. 218, 224 (2010).

King also argues that sentencing guideline § 1B1.2(d) represents a special case in which supporting findings must be made beyond a reasonable doubt. That provision reads: "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). The note explains that when a guilty verdict or plea does not establish the object of a conspiracy, a defendant should be sentenced based on an offense that was the object of the conspiracy "if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to

commit that object offense." *Id.* at n.4. The Eleventh Circuit has applied this provision to require proof of RICO predicate acts beyond a reasonable doubt, see *United States v. Nguyen,* 255 F.3d 1335, 1342 (11th Cir. 2001), but every other circuit to consider the question has held that § 1B1.2(d) does not apply to RICO conspiracies. See *United States v. Massino,* 546 F.3d 123, 135 (2d Cir. 2008); *United States v. Corrado,* 227 F.3d 528, 541–42 (6th Cir. 2000); *United States v. Carrozza,* 4 F.3d 70, 79–80 (1st Cir. 1993). The latter circuits reason that RICO conspiracies are of the single-object variety, with the object being to engage in racketeering. The predicate racketeering acts are not, in themselves, conspiratorial objects.

We have understood RICO conspiracies in the same way as the majority of our sister circuits—that is, as arrangements devoted to a single objective. See *United States v. Tello,* 687 F.3d 785, 794 (7th Cir. 2012); *United States v. Campione,* 942 F.2d 429, 437 (7th Cir. 1991); *United States v. Ashman,* 979 F.2d 469, 485 (7th Cir. 1992) ("The goal of a RICO conspiracy is a violation of RICO."). Consistently with that view, we now hold that § 1B1.2(d) does not apply to RICO conspiracies. We note that this position has the virtue of fitting better with the RICO guideline, § 2E1.1(a)(2), which calls for replacing the RICO baseline of 19 with the level applicable to the most serious underlying conduct if that offense level would be higher. That would make little sense if the underlying conduct had to be treated as separate counts.

### F.   Felipe Zamora

Because he pleaded guilty, Zamora's appeal also is restricted to his sentence. We look first to ensure that the sentence is free from procedural error and, if it is, we then ask

whether it is substantively reasonable. *United States v. An-noreno*, 713 F.3d 352, 356–57 (7th Cir. 2013).

A district court must begin the sentencing proceeding "by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Once it has done so, it must then "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49–50. If the court decides to impose a sentence outside the guidelines range, it is free to do so, but it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50; see also *United States v. Cunningham*, 429 F.3d 673, 675–76 (7th Cir. 2005) (emphasizing need to explain choice of sentence even within guidelines range).

At sentencing, Zamora admitted the factual conclusions of the Presentence Report (PSR) and withdrew his objections to the report. He asked for an offense-level reduction based on acceptance of responsibility, see U.S.S.G. § 3E1.1, and he proposed a guidelines range of 168–210 months. The government opposed the acceptance adjustment and argued for a range of 235–293 months, with the actual sentence to be capped at the 240-month statutory maximum. The district court granted Zamora's acceptance of responsibility request, but it sentenced him to concurrent sentences of 240 months per count.

This is a confusing outcome, at best. The court made no mention of its final calculated guidelines range, even though that is a critical step in sentencing. See *United States v. Robinson*, 435 F.3d 699, 700–01 (7th Cir. 2006). The government suggests that the court probably adopted Zamora's recommendation of 168–210 months, because it granted his request

for acceptance of responsibility. The judgment order partially reflects this, insofar as it records an offense level of 33 and a criminal history of III—a combination that leads to a range of 168–210 months. But the judgment reports a different final range: 168–235 months. There is no such range in the sentencing guidelines, and so this must be an error. For criminal history III, this range looks like a blend of offense levels 33 and 34, but the court never explained it that way, nor did the court justify its deviation from the guidelines, as required by *Gall*.

The court did, however, move on to *Gall*'s second step and considered the § 3553(a) factors. It commented on the "nature and circumstances of this offense" and Zamora's "history and [his] characteristics as a defendant." It also briefly mentioned the seriousness of the offense, the need for deterrence, and the need to protect the public. Other than listing these factors, the court said nothing about why they were served (or not served) by the sentence it chose. It also did not explain why it picked a sentence 30 months above the top of the guidelines range, assuming that the court meant to start with the 168–210 month guidelines calculation. (In fact, the sentence was also above the range that the court recorded, but only by five months.) Either way, there was no explanation for this choice.

With the record in this condition, we conclude that we must vacate Zamora's sentence and send it back to the district court for re-calculation. *Gall* does not permit a district court to skip the process of ascertaining the recommended guidelines range. Here, we do not have that critical piece of data. We also have no explanation from the district court of how much time above the range it thought was proper, and

why. We cannot ignore these procedural problems and jump right to the substantive reasonableness of the sentence. See *Peugh v. United States,* 133 S. Ct. 2072, 2080 (2013) (reviewing the procedures that the district court must follow). Our review of the reasonableness of a sentence is deferential, but in this instance we do not have enough information from the district court to be confident that its choice was made based on accurate information. We thus have nothing to which we can defer.

Zamora's other attack on his sentence does not persuade us, but we do not need to say much about it given our decision to remand for resentencing. He asserts that his sentence is substantively unreasonable because it differs from sentences imposed on several of his co-defendants. All we will say is that § 3553(a)(6) forbids only unwarranted disparities. There are many differences between Zamora and his co-defendants, and so there is no reason to expect identical sentences for them. We are confident that the district court will keep this in mind as it conducts the proceedings on remand.

## G. Luis Garcia

Luis Garcia (whom we call Luis to differentiate him from Vicente Garcia) was another Inca. He pleaded guilty without a plea bargain to one count of participating in the RICO conspiracy and one count of conspiring to distribute cocaine; he was sentenced to concurrent terms of 240 months on the RICO count and 60 months on the drug count, to be followed by four years' supervised release. On appeal, he raises a number of challenges to this sentence.

*Use of Conspiracy To Commit Murder Guideline.* As we have noted, the guideline applicable to RICO is § 2E1.1. It sets a

base offense level of either 19 or the level applicable to the underlying racketeering activity. Luis contends that the highest base offense level that can apply to him is the one found in § 2D1.1, the guideline governing a drug distribution conspiracy; the government argued that the proper referent was § 2A1.5, covering conspiracy to commit murder. The district court adopted the government's position. It found that the use of murder as a tool to maintain the gang's reputation, protect its territory, and further its drug trade was foreseeable to Luis when he joined the conspiracy.

Luis now argues that there was insufficient evidence to show that he either directly participated in acts of murder or violence, or that he could foresee that other Latin Kings would do such things. When he pleaded guilty, he admitted only to drug dealing as a factual basis for the plea. To be held accountable for the conduct of others at sentencing, "that conduct must have been both in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity." *United States v. Edwards*, 115 F.3d 1322, 1327 (7th Cir. 1997) (citing U.S.S.G. § 1B1.3 n.2).

Luis was an active participant in the Latin Kings' activities, both as a drug distributor and as an Inca. The questions are thus whether the conspiracy to commit murder was in furtherance of the activities jointly undertaken by gang members, and whether it was foreseeable to him. The district court had ample evidence pointing to affirmative answers. The Latin Kings' constitution and the Little Village Rules expressly contemplated violence, up to and including homicide. During the trial of the other defendants, witnesses testified that the rules meant that Latin Kings members would

"kill you, bottom line" if you entered their territory. Traffic violators—especially speeders—were to be shot as they drove through. Luis's duties as an Inca included protecting his territory, and that protection foreseeably led to acts of attempted or actual murder. It does not matter that there was no evidence that he pulled a trigger.

*Manager or Supervisor.* Luis received a three-level increase in his offense level pursuant to § 3B1.1(b) for being a supervisor or manager (but not an organizer or leader) of the criminal activity. The district court did not clearly err in so characterizing his role. As we have noted, the key question is whether the defendant holds a managerial or supervisory position in a hierarchical organization; the labels do not matter. *United States v. Figueroa,* 682 F.3d 694, 697 (7th Cir. 2012). The Latin Kings constitution and the various rules spell out the role of the Incas; Luis was an Inca and thus led a chapter. That is enough in our view to support the district court's finding.

*Conditional Discharge.* The district court added two criminal history points to Luis's score when it was calculating his guidelines range because he was on conditional discharge when he committed the offense of conviction. See U.S.S.G. § 4A1.1(d). He had pleaded guilty to state charges of battery and served a term of supervised release between July 12, 2001 and July 12, 2003. On the assumption (not indulged by the district court) that his association with the Latin Kings began in 2007, Luis argues that it was error to make this adjustment.

In fact, other evidence in the record showed that Luis's history with the Latin Kings long predated the years covered by the federal indictment. Luis himself told the probation

officer who prepared his PSR that he was "beaten in" to the Latin Kings in 1995. The indictment charged that the RICO conspiracy began in January 2000. The government used Luis's admission to show that he was a member of that conspiracy before July 2003, when his conditional discharge ended. The fact that he may have joined the drug distribution conspiracy later does not undermine the district court's use of this adjustment.

Luis presented a number of other arguments. They include the same complaints as King makes about the consistency of judicial factfinding by a preponderance of the evidence with the Fifth and Sixth Amendments, and objections to the use of the preponderance standard to find facts relevant to the guidelines calculations, the disparity between his sentence and those of some of his codefendants, and the district court's refusal to grant him a three-point reduction in his offense level for acceptance of responsibility. We find no merit in any of these points: they are barred either by the law, or by the fact that the district court's decisions were not clearly erroneous.

## H. Samuel Gutierrez

Gutierrez was another Inca. He too pleaded guilty to the RICO conspiracy count and the drug conspiracy count. At his plea hearing, Gutierrez admitted to participating in drug distribution and extortion as predicate acts to the RICO conspiracy. He conceded that he participated in four instances of receiving cocaine to sell and that he was involved with extorting the Miqueros from December 2006 to December 2007. He was sentenced to 210 months on the RICO count and 60 months on the drug count, to run concurrently.

The only argument on appeal that Gutierrez advances is that the district court erroneously denied him credit for acceptance of responsibility under sentencing guideline § 3E1.1. The district court rejected his request because, although Gutierrez admitted to drug dealing, extortion, and acts of violence, and through counsel admitted to participating in the planning stages of murder, it found "hardly any reference to what he did over this extended period of time [a]nd certainly there is no acknowledgment, from his lips in any event, that this conspiracy involved murder." The court recognized that Gutierrez admitted that the RICO conspiracy involved "numerous weapons and violent actions," but it found that his apology "totally ignores the … victims of the activities" other than his family and friends. Gutierrez, the court concluded, had gone only "half the distance" needed to accept true responsibility for what the Latin Kings had done.

In order to qualify for the acceptance reduction, a defendant must "(1) demonstrate sincere remorse or contrition, (2) truthfully admit the conduct comprising the offense, and (3) neither falsely deny nor frivolously contest relevant conduct." *United States v. Eschman*, 227 F.3d 886, 891 (7th Cir. 2000). In *Eschman*, we found clear error in the district court's decision to deny any discount for acceptance of responsibility. The defendant there had demonstrated his acceptance promptly and consistently, shown remorse, and did not actively deny any relevant conduct, although he did contest the manner in which the government had calculated the amount of drugs underlying his offense. *Id.* We agreed with the defendant's position on the drug-quantity point. Because it appeared that the district court based its denial primarily on the defendant's objection to the calculation of quantity,

which had been made in good faith, was non-frivolous, and did not negate his acceptance, we remanded for re-sentencing. *Id.* at 891–92.

The district court's explanation for its decision on Gutierrez's request for the adjustment is hard to follow. It appeared to find that Gutierrez was sincerely remorseful, saying that "there is no doubt that he is sorry and that he would apologize." There is no indication that the court thought that Gutierrez was being untruthful about the offense conduct. Instead, the court appeared to be troubled that Gutierrez's admissions did not go far enough: (1) he did not, the court thought, explicitly admit participation in the conspiracy insofar as it involved murder; (2) on a more general level, the court thought that he did not "accept true responsibility" for the full scope of the gang's activities; (3) the court understood his apology to extend only to his family and friends, not to the entire community; and (4) the court was reluctant to find acceptance for someone who was a leader in such a bad organization. None of these reasons, we conclude, holds up under examination.

The court's concern with the scope of Gutierrez's factual admissions (reason 1) must be assessed in light of what Gutierrez actually said at sentencing. It appears that Gutierrez's proficiency in English was limited, and so the statement is somewhat uneven. Gutierrez openly stated that "[w]e used violence to get what I get what we want." The transcript also reflects that he said that he knew violence "*surely* happens and I knew that would happen" in the Latin Kings. But there is more evidence: a transcript of the note from which he was reading when he made that statement reveals that he meant to say "I knew … that *shootings* hap-

pened and would happen." Even if the court had heard him the same way the court reporter did, his admissions placed no limitation on the kind of violence that the gang was prepared to use. The court's insistence on something "from his lips" was somewhat unrealistic, given his language difficulties. More importantly, Gutierrez was not charged directly with conspiracy to commit murder; that offense was just relevant conduct for sentencing. The guidelines require only that a defendant "truthfully admit[] the conduct comprising the offense(s) of conviction, and truthfully admit[] or not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 3E1.1 cmt. n.1(A). If there had been any doubt, Gutierrez's attorney removed it when he said that Gutierrez "admits that in pleading guilty to the racketeering conspiracy that murder conspiracy was a reasonably foreseeable consequence." Finally, unlike Luis Garcia, Gutierrez did not contest the application of the guideline for conspiracy to commit murder, § 2A1.5. All told, the district court's first reason for denying the acceptance-of-responsibility adjustment does not withstand scrutiny.

The second reason—that Gutierrez did not accept *true* responsibility for the full scope of the gang's activities—fares no better. The problem here is that there is no evidence to back up this conclusion; we cannot tell what the district court thought was missing from Gutierrez's statement. Gutierrez admitted all of the particular details of his offense. Perhaps he could have said more about what an awful group the Latin Kings were and how sorry he was to have participated in the gang for so long, but that relates more to remorse than particular acts, and the court seemed to be satisfied that he was remorseful. We have the same concern

about the court's third reason—that the apology did not mention the community at large. And we are not sure what the court was getting at with its fourth point. It is unlikely that it meant that acceptance of responsibility is unavailable to leaders of large RICO and drug conspiracies; that would be wrong as a matter of law, but we would not infer that kind of error on the district court's part. Perhaps the court did not mean to place separate weight on the fourth point, and was just editorializing. We cannot be sure.

We do not mean to imply that Gutierrez was entitled to this adjustment as a matter of law. A district court, exercising its discretion, could go either way. But the court's explanation for its decision to deny the reduction is insufficient. We therefore will vacate Gutierrez's sentence and remand for resentencing.

## I.   Javier Ramirez

The last defendant whose appeal we must resolve is Ramirez. He too was an Inca, and like several others, he pleaded guilty to participating in the RICO conspiracy and the drug conspiracy. He was sentenced to 180 months for the former and 60 months for the latter, to run consecutively. Thus, his total sentence was 240 months.

Ramirez adopted by reference two of the claims that King raised: that his Fifth and Sixth Amendment rights were violated by the court's use of a preponderance of the evidence standard rather than a reasonable-doubt standard at sentencing to find that Oberia Pierce's murder was a predicate act of the RICO conspiracy; and that the court violated sentencing guideline § 2A1.1 by relying on Pierce's murder in calculating his guidelines range. For the same reasons we

offered in our discussion of King's appeal, we reject these arguments.

Ramirez also raises several factual arguments about his sentence; our review of these points is for clear error only. First, he asserts that the facts did not show that he was involved with the Pierce murder. The PSR had calculated an offense level of 37 for him, which it reached by adding the base level of 33 provided by § 2A1.5 and a four-level enhancement because the murder was undertaken for pecuniary gain. The court, however, decided to rely on § 2A1.1, which is the first-degree murder guideline, and this had the effect of raising his base offense level to 43. It did so because undisputed evidence from the Zambrano trial showed that Pierce was murdered.

The jury heard evidence that Ramirez discussed the shooting three days later with Shanna. During that conversation, Ramirez said that Pierce was shot by "some of [his] guys" because Milton and Pierce "tr[ied] to grow balls and sh** one time." The next time Ramirez's underlings saw Milton and Pierce in the neighborhood, Ramirez noted that the gang members shot them. Ramirez also said that he was hiding the shooter near his house.

Ramirez concedes that these events took place and that he was at least an accessory after-the-fact to the murder. He argues, however, that he should not be liable for these actions of his co-conspirators. During his plea colloquy, he argued that the Latin Kings had "concrete goals" and thus not all criminal activity in Little Village was in furtherance of the Latin Kings' conspiracy. In particular, he contended that the Pierce murder was outside the scope of the conspiracy that he joined. He suggested that there is no evidence indicating

why Pierce and Morgan were shot at, nor anything to show who actually pulled the trigger.

Ramirez's characterization of the evidence is not entirely accurate. The government presented evidence about why Pierce was shot; it also introduced evidence connecting the shooter to Ramirez in his capacity as a Latin King. Most damning are Ramirez's own admissions, summarized in part above. Ramirez's argument also suffers from a legal misunderstanding. There is no heightened standard of proof that applies to his sentencing proceeding. Nor did the court commit clear error when it found that the government proved by a preponderance of the evidence that the homicide was foreseeable to Ramirez, that it was done to further the conspiracy's goals, and that it could be attributed to Ramirez under *Pinkerton*. See *United States v. Morales*, 655 F.3d 608, 638 (7th Cir. 2011) (attributing co-conspirators' violent acts to defendants at sentencing under similar circumstances); see also *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003) (even if defendant was a fringe member of the conspiracy, so long as he joined it and the violent acts were reasonably foreseeable to him, murder committed by a co-conspirator could be attributed to him). Given our deference to the district court's findings of fact, we see no reversible error in Ramirez's sentence.

## IV

After all is said and done, most of this complex and important criminal trial will remain undisturbed. We AFFIRM the convictions and sentences of Augustin Zambrano, Vicente Garcia, Jose Guzman, and Alfonso Chavez. We also AFFIRM the sentences of Fernando King, Luis Garcia, and Javier Ramirez. We VACATE the sentences of Felipe Zamora

and Samuel Gutierrez and REMAND those two cases to the district court for further proceedings consistent with this opinion.